SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**Magic Petroleum Corporation v. Exxon Mobil Corporation (A-46-12) (069083)**

**Argued November 6, 2013 -- Decided July 28, 2014**

**FERNANDEZ-VINA, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a property owner's claims for contribution under the Spill Compensation and Control Act (Spill Act or Act), N.J.S.A. 58:10-23.11 to -23.24, must be deferred under the doctrine of primary jurisdiction until after the conclusion of New Jersey Department of Environmental Protection (DEP) remediation enforcement actions, or whether a property owner may proceed against responsible parties to recover sums expended to remediate the site before the DEP concludes its involvement in the site.

In a proceeding before the Office of Administrative Law (OAL), the DEP sued Magic Petroleum, Inc. (Magic) for expenses incurred during the remediation of hazardous material on land owned and operated by the company. Although Magic asserted that other parties were responsible, Magic bore the entire cost of cleanup pursuant to the DEP's determination that Magic was a discharger.

On August 12, 2003, while the DEP proceedings were ongoing, Magic filed a claim for contribution in the Superior Court under the Spill Act, alleging that Exxon Mobil Corporation (ExxonMobil) and several other parties were responsible for a portion of the costs associated with the cleanup. The trial court dismissed Magic's claim without prejudice, reasoning that, under the doctrine of primary jurisdiction, the contribution claim could only be filed following complete remediation of the site. The court adduced that deferring the case to the DEP would afford the Department time to employ its expertise in evaluating the full extent of the contamination and total costs of the cleanup, components essential to awarding the final allocation of costs following completion of the remediation. Magic moved for reconsideration, which was denied.

Magic appealed, and the Appellate Division affirmed the trial court's orders dismissing the complaint and affirming the denial of Magic's request for reconsideration. The panel reasoned that while the Superior Court and the DEP have concurrent jurisdiction to determine whether ExxonMobil is a discharger, only the DEP could identify the contamination, analyze the extent of the discharge, and devise a cleanup strategy. Those findings, the panel continued, needed to be made prior to the Superior Court's allocation of liability. Furthermore, the panel held that a party must first obtain written approval of the remediation plan from the DEP before commencing a contribution claim under the Spill Act. The Court granted Magic's petition for certification. 213 N.J. 387 (2013).

**HELD**: Plaintiff property owners or other responsible parties may file contribution claims in Superior Court, and a court may allocate liability before the final resolution of a site remediation plan by the DEP. The trial court may assign liability based on evidence presented at trial, but may not be able to issue a final damages award. In addition, a party need not obtain written approval of the remediation plan prior to filing a claim for contribution.

1. The New Jersey Legislature enacted the Spill Act in 1976 to "stem the threat to the economy and environment of the State posed by the discharge of petroleum products and other hazardous substances." Marsh v. N.J. Dep't. of Envtl. Prot., 152 N.J. 137, 144 (1997) (internal quotation omitted). The Act prohibits the "discharge" of "hazardous substances" into the environment and provides for the cleanup of that discharge. N.J.S.A. 58:10-23.11c. (pp. 11-12)

2. The DEP is charged with managing public funds to quickly and efficiently restore lands spoiled with environmental contamination. N.J.S.A. 58:10-23.11f(a)(1) (authorizing the DEP to "act to clean up and remove or arrange for cleanup and removal of such discharge" or to "direct the discharger to clean up and remove or arrange for the cleanup and removal of the discharge"). The Legislature established strict liability for causing environmental contamination and mandated that dischargers are jointly and severally liable. N.J.S.A. 58:10-23.11g(c)(1). Thus, the DEP may collect the entire amount of cleanup costs from one discharger, even when that party was only partially responsible for the spill. (pp. 12-13)

3. In 1992, the Legislature amended the Spill Act to clarify that dischargers ordered by the DEP to pay for the entirety of cleanup costs were entitled to seek contribution from other responsible parties, based in part, on "the normal course of tort law." L. 1991, c. 372, § 14. At the time of the amendment's passage, the "normal course of tort law" included the already-existing right of contribution, codified in the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1, as modified by the Comparative Negligence Act, N.J.S.A. 2A:15-5.1. In pertinent part, the Spill Act provides that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance." N.J.S.A. 58:10-23.11f(a)(2)(a). (pp. 13-15)

4. Importantly, the Legislature directed that contribution plaintiffs seek relief before a court. The Legislature bestowed upon the courts liberal discretion to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." N.J.S.A. 58:10-23.11f(a)(2)(a). The Legislature went further to ensure private entity dischargers were not prevented from seeking recourse in the courts, dictating that "[n]othing in [N.J.S.A. 58:10-23.11f(a)(2)(a)] shall affect the right of any party to seek contribution pursuant to any other statute or under common law." Thus, the Legislature established a private right of action in contribution so that dischargers designated by the DEP could share the cost of remediation with additional potentially responsible dischargers not initially designated by the DEP. The Legislature focused on the courts as the venue to allocate liability percentages, while the DEP continued to apply its expertise in the remediation of the site. (pp. 15-17)

5. This appeal requires the Court to address the doctrine of primary jurisdiction. Primary jurisdiction is applicable when a case is properly filed in the Superior Court but the court declines original jurisdiction, referring specific issues to the appropriate administrative body. The court gives deference to the administrative body's interpretation of its own regulations and findings of fact on particular issues that are within the special competence of the agency pursuant to applicable statutes. Essentially, the court retains jurisdiction but defers action until the agency has reviewed the case and employed its expertise. In instances where the court and the agency have concurrent jurisdiction, disputed factual issues should be evaluated by the agency because of its expertise, but legal issues should be left to the court to decide. Although no formula exists to evaluate the applicability of primary jurisdiction, our courts have been guided by a four-part test, which considers (1) whether the matter is within the conventional experience of judges; (2) whether the matter is peculiarly within the agency's discretion, or requires expertise; (3) whether inconsistent rulings might disrupt the statutory scheme; and (4) whether prior application has been made to the agency. (pp. 17-20)

6. Primary jurisdiction is not applicable in this contribution claim. First, dischargers statutorily are afforded the same right as the DEP to sue other potentially responsible parties in order to recover contribution costs for contamination where other parties caused a portion of the discharge. Additionally, the Spill Act gives the court, not the DEP, jurisdiction over contribution claims. N.J.S.A. 58:10-23.11f(a)(2)(a). Indeed, here, the DEP implicitly conceded that a claim for contribution, and specifically the allocation of liability, is a form of recourse not within the DEP's jurisdiction. Moreover, contribution claims do not necessitate the expertise of the DEP because allocating liability and considering expert testimony are matters within the conventional experience of judges. Therefore, the DEP and the courts share concurrent jurisdiction over the recovery of cleanup costs. (pp. 20-24)

7. Finally, a contribution plaintiff need not obtain the DEP's written approval of the investigation and remediation plan prior to filing a claim for contribution. The Court reaches this conclusion based upon the plain language of the statute and the clear Legislative intent to amend the Spill Act to clarify and permit a private claim for contribution. The issue of allocation of liability is independent from the issue of the total amount of the costs. While dischargers are required to have written approval for the actual expenses that they incur for the purpose of remediation in order to seek contribution for those expenses, that is not a prerequisite to allocation of responsibility for the costs associated with the approved remediation. (pp. 25-27)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA and ALBIN, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE PATTERSON did not participate.**

MAGIC PETROLEUM CORPORATION,

    Plaintiff-Appellant,

        v.

EXXON MOBIL CORPORATION and
MARIE TIRICO,

    Defendants-Respondents,

        and

TRENTON OIL COMPANY and M.M.
WERTHEIM CORPORATION,

    Defendants

        and

EXXON MOBIL CORPORATION,

    Defendant/Third-Party
    Plaintiff-Respondent

        v.

LINKING RING PETROLEUM,

    Third-Party Defendant.

        Argued April 1, 2014 – Decided July 28, 2014

        On certification to the Superior Court,
        Appellate Division.

        Michael G. Sinkevich, Jr., argued the cause
        for appellant (Lieberman & Blecher,
        attorneys; Stuart J. Lieberman, of counsel).

        Robert T. Lehman argued the cause for
        respondent Exxon Mobil Corporation (Archer &

Greiner, attorneys; Mr. Lehman, Adam P. Baas, and Sarah A. Gribbin, on the briefs).

Lance J. Kalik submitted a letter in lieu of brief on behalf of respondent Marie Tirico (Riker Danzig Scherer Hyland & Perretti, attorneys).

Martha N. Donovan argued the cause for amicus curiae New Jersey Apartment Association (Norris McLaughlin & Marcus, attorneys; Ms. Donovan and Edward A. Hogan, on the brief).

Martha N. Donovan submitted a brief on behalf of amicus curiae Ironstate Development Co., Ltd. (Norris McLaughlin & Marcus, attorneys; Ms. Donovan and Edward A. Hogan, on the brief).

JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

When environmental contamination occurs, the Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, makes all dischargers jointly and severally liable for the entire cost of cleanup. The New Jersey Department of Environmental Protection (DEP or Department) is involved in a spill cleanup either by affirmatively compelling a "discharger" to remediate the site or by managing remediation accomplished by parties. Remediation expenses are the responsibility of the party or parties who are "in any way responsible" for the pollution. N.J.S.A. 58:10-23.11g. The Spill Act specifically authorizes a private right of action, thus allowing parties to seek contribution totaling an amount equal to the party's share

2

of liability for the remediation costs from other responsible parties.  See N.J.S.A. 58:10-23.11f(a)(2)(a).

In this appeal, we consider whether a property owner's claims for contribution under the Spill Act must be deferred under the doctrine of primary jurisdiction until after the conclusion of DEP remediation enforcement actions or whether a property owner may proceed against responsible parties to recover sums expended to remediate the site before the DEP concludes its involvement in the site.

The facts in this case led to two separate legal actions. In the first case, the DEP sued Magic Petroleum, Inc. (Magic) for expenses incurred during the remediation of hazardous material on land owned and operated by the company.  Although Magic asserted that other parties were responsible, Magic bore the entire cost of cleanup pursuant to the DEP's determination that Magic was a discharger.  Magic then sought contribution from Exxon Mobil Corporation (ExxonMobil), the owner of neighboring land, to defray the cost of the cleanup.  That action started the pending case.  Magic's claim was dismissed without prejudice by the trial court, which reasoned that, under the doctrine of primary jurisdiction, the contribution claim could only be filed following complete remediation of the site. The court adduced that deferring the case to the DEP would afford the Department time to employ its expertise in evaluating the full extent of the contamination and total costs of the

3

cleanup, components essential to awarding the final allocation of costs following completion of the remediation.

The Appellate Division affirmed the trial court's decision. The appellate panel recognized that the Superior Court and the DEP have concurrent jurisdiction to determine whether ExxonMobil is a discharger, but the DEP has sole jurisdiction over identifying contaminants on the land and assessing the extent of the discharge in order to formulate the proper remediation plan. Furthermore, the panel held that a party must first obtain written approval of the remediation plan from the DEP before commencing a contribution claim under the Spill Act.

While the extent of the cleanup has yet to be ascertained, we agree that the trial court may determine, subject to proofs, whether ExxonMobil is also responsible for the contamination. Moreover, we conclude that the trial court may assign liability to responsible parties, based on evidence presented at trial, but we note that the court may not be able to issue a final damages award. Further, we determine that a party need not obtain written approval of the remediation plan prior to filing a claim for contribution. Therefore, we reverse the judgment of the Appellate Division and remand to the trial court.

I.

A.

In the early 1990s, Magic purchased Lot 19.01 in the Clarksburg area of Millstone Township. On that lot, Magic owned

4

and operated a gasoline refueling and service station, which was subsequently discovered to be the source of ground and water contamination on the land.  Across the street, ExxonMobil owned a parcel of land, designated as Lot 11,[1] where it operated another gasoline refueling station, rife with its own contamination issues.

At the time of purchase, Magic was aware that its property contained several underground storage tanks (USTs), that were leaking petroleum hydrocarbons into the soil and ground water.  In fact, the DEP became involved with Lot 19.01 in 1989, years before Magic purchased the land, after the DEP detected strong petroleum odors and ionization on the land.  Those contaminants were later determined to be a "discharge" pursuant to the Spill Act, N.J.S.A. 58:10-23.11b.  As a result, two USTs were removed in 1991.

In 1995, the DEP issued a Field Directive notifying Magic of the need to investigate and remediate the hazardous substances discharged on Lot 19.01.  In 1997, Magic had three more USTs removed from the property.  In 1999, Magic entered into an Administrative Consent Order (ACO) with the DEP, whereby Magic agreed to remediate the property under DEP oversight.  The DEP issued an Administrative Order and Notice of Civil

---

[1] Defendant Marie Tirico purchased Lot 11 from ExxonMobil in 1988.  Tirico then sold Lot 11 to defendant Trenton Oil Company. Later, Magic's principal, Avinash Vashisht, acquired Lot 11 and transferred it to another corporation, Linking Ring Petroleum, also owned by Vashisht.

5

Administrative Penalty Assessment on May 9, 2003, when, according to the DEP, Magic failed to comply with the ACO.

Magic requested an administrative hearing and the case was transferred to the Office of Administrative Law (OAL). Magic asserted that the proceeding should be stayed to admit ExxonMobil as a party so that liability could be allocated to each potentially responsible party accordingly.

Magic also sent letters to the DEP requesting that the agency join ExxonMobil in the remediation plan. The DEP responded by letter dated August 21, 2003, directing that "the assessment of a percentage of the responsibility is best addressed in negotiation with ExxonMobil or before the [c]ourt."

An administrative hearing was held, and on November 1, 2006, an Administrative Law Judge (ALJ) concluded that the contamination of Lot 19.01 was properly attributed to a discharge for which Magic was "in any way responsible" under N.J.S.A. 58:10-23.11g. The ALJ also found that Magic was in violation of the ACO. The DEP adopted the ALJ's decision on December 18, 2006.

Before completion of the OAL proceeding, Magic filed a complaint in Superior Court, Law Division in which it alleged that the 1999 ACO was a contract, that DEP breached the contract and that DEP breached the duty of good faith and fair dealing. A Law Division judge dismissed the case on October 4, 2006. Magic then appealed the dismissal of the case and the final

6

decision of the DEP to the Appellate Division, which consolidated the cases and affirmed both judgments. We denied certification. <u>Vashisht v. N.J. Dep't. of Envtl. Prot.</u>, 198 <u>N.J.</u> 473 (2009).

B.

On August 12, 2003, while the DEP proceedings were ongoing, Magic filed a claim for contribution in the Superior Court under the Spill Act, alleging that ExxonMobil and several other parties were responsible for a portion of the costs associated with the cleanup of the contamination on Lot 19.01. That claim gave rise to this appeal. Both Magic and ExxonMobil engaged in extensive discovery efforts, including serving and answering interrogatories, hiring experts, and obtaining reports regarding which party was responsible for the contamination of Lot 19.01.

On June 14, 2010, ExxonMobil filed a notice to stay the case or to dismiss the complaint without prejudice. In support of its motions, ExxonMobil asserted that the DEP's determination of necessary remediation projects must precede any court allocation of liability under the Spill Act. The court dismissed the case without prejudice, reasoning that, since the DEP was already on Magic's property collecting data about the discharge contaminants, the allocation of liability would be more accurate if adjudged after the DEP had detailed information about the extent of the contamination and necessary remediation. The court focused on the DEP's current role in the

7

remediation on Lot 19.01 and the DEP's function in the evaluation of the type of cleanup that would be required. That assessment would substantially affect the dollar amount of cleanup costs to be paid by the responsible parties. Magic moved for reconsideration, which was denied.

Magic appealed to the Appellate Division. In an unpublished opinion, the Appellate Division affirmed the trial court's order dismissing the complaint without prejudice and affirming the denial of Magic's request for reconsideration. The appellate panel reasoned that, while the Superior Court had sole jurisdiction to allocate the costs of remediation among liable parties, several other issues needed to be addressed before reaching the allocation of liability.

Specifically, the Appellate Division stated that, although the court and the DEP had concurrent jurisdiction over whether ExxonMobil was a "party in any way responsible," only the DEP could identify the contamination, analyze the extent of the discharge, and devise a cleanup strategy. Those findings, the panel continued, needed to be made prior to the Superior Court's allocation of liability. Relying on the doctrine of primary jurisdiction, the Appellate Division found that the unsettled issues would be best decided by the expertise of the DEP so as to avoid inconsistent rulings. The Appellate Division also declared that Magic, and any other party seeking contribution

under the Spill Act, must obtain written approval from the DEP for the remediation plan prior to filing a contribution claim.

Magic petitioned this Court, and we granted certification. 213 N.J. 387 (2013).

## II.

Magic argues that the trial court's dismissal of its contribution claim was improper because primary jurisdiction is not applicable. Relying on N.J.S.A. 58:10-23.11f, Magic asserts that the Legislature did not include any language either limiting a party's recourse in the courts or requiring that a party wait until after the environmental investigation is complete and the remedial action plan is approved before filing a contribution claim. Magic maintains that the plain language of the statute bestows upon the court broad powers to allocate liability in contribution claims, permitting the court to use "such equitable factors as the court determines are appropriate." N.J.S.A. 58:10-23.11f(a)(2)(a).

As a corollary, Magic contends that written approval by the DEP for the investigation and proposed remediation plan is not required prior to filing a claim for contribution, contrary to the Appellate Division's decision. In support of this argument, Magic relies on the new regulatory scheme for site cleanup governed by the Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29. That statute changed the mechanism for remediation projects by placing the bulk of oversight duties in the hands of

9

licensed site remediation professionals[2] (LSRPs) and retaining

only minimal oversight responsibilities for the DEP.  See

N.J.S.A. 58:10C-1.3; see also N.J.S.A. 58:10C-27.  Magic argues

that demanding written approval prior to the filing of a

contribution claim is impractical and impossible in light of

this legislation because the DEP no longer oversees remediation

projects or provides approval for remediation plans.

ExxonMobil argues that the trial court appropriately

applied the doctrine of primary jurisdiction in dismissing the

case without prejudice because only the DEP has the authority to

determine the scope and nature of a party's discharge liability.

Further, ExxonMobil contends that the DEP should be allowed to

ascertain specific facts within its expertise before the

contribution claim can proceed, particularly because the DEP is

required to verify the extent of discharge and evaluate the

remediation plan on Magic's property, in accordance with the

ACO.

Furthermore, ExxonMobil contends that in order for a party

to recover in a contribution claim, the expenses for which the

party seeks contribution must meet the definition of "cleanup

---

[2] Licensed site remediation professionals are individuals who
independently oversee the cleanup of contaminated sites,
ensuring that the process is conducted effectively and in
compliance with New Jersey statutes and regulations.  See
N.J.S.A. 58:10C-14.  The Site Remediation Professional Licensing
Board issues licenses for LSRPs based on strict criteria,
including a particular level of education and experience in the
environmental field.  See N.J.S.A. 58:10C-3, -5.

and removal costs."  ExxonMobil contends that the Spill Act dictates that "cleanup and removal costs" are only those for which the party has obtained prior "written approval from the [D]epartment."  N.J.S.A. 58:10-23.11b.  Accordingly, ExxonMobil insists that a party seeking contribution must have written approval for the remediation plan prior to filing a claim for contribution.

The New Jersey Apartment Association and Ironstate Development Co. Ltd., appearing as amici curiae, join in Magic's assertion that written approval from the DEP is not required prior to filing a claim for contribution.  Amici reason that such a prerequisite would cause an exceptionally burdensome backlog of remediation cases for the DEP.

III.

A.

In 1976, New Jersey Legislature enacted the Spill Act in an effort to "stem the 'threat to the economy and environment of the State' posed by the 'discharge of petroleum products and other hazardous substances.'"  Marsh v. N.J. Dep't. of Envtl. Prot., 152 N.J. 137, 144 (1997) (quoting N.J.S.A. 58:10-23.11a); see also Buonviaggio v. Hillsborough Twp. Comm., 122 N.J. 5, 8 (1991).  The stated purpose of the Spill Act is

> to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said

11

substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharges.

[N.J.S.A. 58:10-23.11a.]

Importantly, the Spill Act prohibits the "discharge" of "hazardous substances" into the environment and provides for the cleanup of that discharge. N.J.S.A. 58:10-23.11c; accord Buonviaggio, supra, 122 N.J. at 8. In keeping with the Legislature's intent that the Spill Act be liberally construed,[3] "discharge" is defined broadly as

> any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters, or natural resources within the jurisdiction of the State.
>
> [N.J.S.A. 58:10-23.11b.]

Moreover, under provisions of the Spill Act, the DEP is charged with managing public funds to quickly and efficiently restore lands spoiled with environmental contamination. Marsh, supra, 152 N.J. at 145. Accordingly, the DEP also is authorized to "act to clean up and remove or arrange for cleanup and removal of such discharge or may direct the discharger to clean

---

[3] "The Spill Act being necessary for the general health, safety, and welfare of the people of this State, shall be liberally construed to effect its purposes." N.J.S.A. 58:10-23.11x.

up and remove or arrange for the cleanup and removal of the discharge." N.J.S.A. 58:10-23.11f(a)(1). The Legislature established strict liability for causing environmental contamination:

> [A]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.
>
> [N.J.S.A. 58:10-23.11g(c)(1).]

Therein, the Legislature also mandated that dischargers are jointly and severally liable. Ibid. Thus, the DEP may collect the entire amount of cleanup costs from one discharger, even when that party was only partially responsible for the spill.

However, the DEP is not the only entity entitled to recover cleanup costs. In 1992, the Legislature amended the Spill Act to clarify that dischargers ordered by the DEP to pay for the entirety of cleanup costs were entitled to seek contribution from other responsible parties, based in part, on "the normal course of tort law." L. 1991, c. 372, § 14; see Statement to S. 2657, A. 3659 at 6 (June 11, 1990).

At the time of the amendment's passage, the "normal course of tort law" included the already-existing right of contribution, codified in the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1, as modified by the Comparative Negligence Act, N.J.S.A. 2A:15-5.1. See Young v. Latta, 123

13

N.J. 584, 592 (1991). The right of contribution is a statutory construction. See N.J.S.A. 2A:53A-3; Young, supra, 123 N.J. at 588. The basic purpose in creating the right of contribution was to achieve "a sharing of the common responsibility [among tortfeasors] according to equity and natural justice." Sattelberger v. Telep, 14 N.J. 353, 367-368 (1954). Therein, the general right of contribution invokes several liability by intending that the defendant-in-contribution shall pay no more than the party's percentage of liability. N.J.S.A. 2A:15-5.3(e).

The purpose of the contribution amendment to the Spill Act was to encourage prompt and effective remediation by those parties responsible for contamination who might otherwise be reluctant to cooperate in the remediation efforts for fear of bearing the entire cost of cleanup when other parties were also responsible for the creation and continuation of the discharge. S. Envtl. Quality Comm., Statement to S. Comm. Substitute for S. No. 2657 and Assemb. No. 3659, 204 Leg. at 1-2 (Dec. 10, 1990) [hereinafter Statement to S. Substitute S. No. 2657]. In pertinent part, the Spill Act provides that

> [w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and

14

> removal of that discharge of a hazardous substance.
>
> [N.J.S.A. 58:10-23.11f(a)(2)(a).]

The amendment expressly created a separate contribution cause of action for private parties seeking to recover a portion of the cleanup costs.  See Hous. Auth. v. Suydam Investors, L.L.C., 177 N.J. 2, 18 (2003).  "In order to accomplish a fair and equitable ultimate sharing of the remediation burden among all responsible parties and thereby to promote contamination cleanup, N.J.S.A. 58:10-23.11f(a)(2)(a) casts a broad net encompassing 'all other dischargers and persons in any way responsible for a discharged hazardous substance . . . .'" Pitney Bowes, Inc. v. Baker Indus., Inc., 277 N.J. Super. 484, 487-88 (App. Div. 1994); see also Cyktor v. Aspen Manor Condo. Ass'n, 359 N.J. Super. 459, 476 (App. Div. 2003) (internal citations omitted) (stating that contribution provision was enacted to "provide a right of contribution to 'accomplish a fair and equitable . . . sharing of the remediation burden among all responsible parties'") (alteration in original) (quoting Pitney Bowes, supra, 277 N.J. Super. at 488).

Importantly, the Legislature directed that contribution plaintiffs seek relief before a court.  The Legislature bestowed upon the courts liberal discretion to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate."  N.J.S.A.

15

58:10-23.11f(a)(2)(a).  The Legislature went further to ensure private entity dischargers were not prevented from seeking recourse in the courts, dictating that "[n]othing in [N.J.S.A. 58:10-23.11f(a)(2)(a)] shall affect the right of any party to seek contribution pursuant to any other statute or under common law."  Ibid.

Federal courts interpreting the Spill Act have set out several factors, which may provide guidance to New Jersey courts allocating contribution costs for remediation of hazardous substances.  The Federal District Court in New Jersey suggests the following considerations, better known as the "Gore factors"

> (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (2) the amount of the hazardous waste involved;
>
> (3) the degree of toxicity of the hazardous waste involved;
>
> (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
>
> (6) the degree of cooperation by the parties with the federal, state or local officials to prevent any harm to the public health or the environment.

16

> [*Lenox Inc. v. Reuben Smith Rubbish Removal*,
> 91 F. Supp. 2d 743, 747 (D.N.J. 2000).
> (citation omitted).]

Additionally, courts may look to any other "equitable factors as the court determines are appropriate" to allocate liability. N.J.S.A. 58:10-23.11f(a)(2)(a).

Thus, under the Spill Act, the Legislature established a private right of action in contribution so that dischargers designated by the DEP could share the cost of remediation with additional potentially responsible dischargers not initially designated by the DEP. The Legislature focused on the courts as the venue to allocate liability percentages for such recourse, while the DEP continued to apply its expertise in the remediation of the site.

### B.

This appeal also requires us to address the doctrine of primary jurisdiction. The doctrine of primary jurisdiction is applicable when a case is properly filed in the Superior Court but the court declines original jurisdiction, referring specific issues to the appropriate administrative body. *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 269 n.1 (1978). The court gives deference to the administrative body's interpretation of its own regulations and findings of fact on particular issues that are within the special competence of the agency pursuant to applicable statutes. *See ibid.* Essentially, the court retains jurisdiction but defers action until the agency has reviewed the

17

case and employed its expertise.  See Campione v. Adamar, Inc., 155 N.J. 245, 264 (1998).

This doctrine is especially important for "'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'"  Boss v. Rockland Elec. Co., 95 N.J. 33, 40 (1983) (quoting United States v. W. Pac. R.R. Co., 352 U.S. 59, 63-64, 77 S. Ct. 161, 164-65, 1 L. Ed. 2d 126, 132 (1956)).

In instances where the court and the agency have concurrent jurisdiction, disputed factual issues should be evaluated by the agency because of its expertise, but legal issues should be left to the court to decide.  See ibid. ("[W]here the resolution of a contested legal issue properly brought before a court necessarily turns on factual issues within the special province of an administrative agency, the court should refer the factual issues to that agency.").  On the other hand, "[w]hen the legal rights of parties are clear, it is unjust and unfair to burden them with an administrative proceeding to vindicate their rights."  Ibid. (citing N.J. Civil Serv. Ass'n v. State, 88 N.J. 605, 613 (1982)).

In Boss, a utility company sought to cut down trees on a residential property rather than trim and prune them under a long-standing easement.  Id. at 36-37.  This Court concluded that a provision in the easement needed to be interpreted in accordance with regulations of the Board of Public Utilities

18

(BPU) prior to any judicial action, reasoning that "when the determination of the legal issue must be preceded by 'the taking of the necessary evidence and the making of necessary factual findings,' it is best done by the administrative agency specifically equipped to inquire into the facts."  Id. at 39-40 (quoting Roadway Express, Inc. v. Kingsley, 37 N.J. 136, 140 (1962)).  Thus, the Court remanded the case, instructing that the BPU Commissioners make factual findings, which would then be submitted to the trial court for a decision on the legal issue. Id. at 42.

By contrast, this Court found that, in the interest of justice and an expeditious remedy, a taxpayer need not pursue a formal appeal to an agency for a refund of over-assessed taxes paid because of clerical errors on the part of the municipality. Farmingdale Realty Co. v. Borough of Farmingdale, 55 N.J. 103, 110-11 (1969).  Focusing on administrative exhaustion, this Court reasoned that, although the taxpayer might have appealed to the agency, the trial court appropriately could enter a judgment because the case involved only legal questions.  Id. at 112-13.

Moreover, where the Legislature did not provide an adequate remedy for relief before the agency and did not intend to prevent persons from seeking such recourse before the courts, we held that individuals may bring common-law claims in the Superior Court, even when the subject matter of the claims is

19

related to the agency's purview.  <u>Campione</u>, <u>supra</u>, 155 <u>N.J.</u> at 260.  In <u>Campione</u>, the plaintiff sought to recover money damages for malicious prosecution, breach of contract, and discrimination based on the defendant casino's enforcement of gaming regulations against plaintiff for card counting.  <u>Id.</u> at 249.  When analyzing the Casino Control Act (CCA), <u>N.J.S.A.</u> 5:12-1 to -142, this Court found that the Legislature did not create a forum for private individuals to bring grievances before the Casino Control Commission (CCC), and the Court therefore held that the plaintiff had properly filed his claims in the Superior Court.  <u>Id.</u> at 262.  On the other hand, the Court determined that primary jurisdiction was applicable to the extent that the claim depended on interpretation of the CCA or agency regulations, and ordered that the case should be referred to the CCC for consideration of those matters alone.  <u>Id.</u> at 264.

Although no formula exists to evaluate the applicability of primary jurisdiction, our courts have been guided by a four-part test, basing primary jurisdiction decisions on

> 1) whether the matter at issue is within the conventional experience of judges;  2) whether the matter is peculiarly within the agency's discretion, or requires agency expertise;  3) whether inconsistent rulings might pose a danger of disrupting the statutory scheme;  and 4) whether prior application has been made to the agency.
>
> [<u>Boldt v. Correspondence Mgmt., Inc.</u>, 320 <u>N.J. Super.</u> 74, 85 (App. Div. 1999).]

IV.

Applying these principles to this appeal, we conclude first that primary jurisdiction is not applicable in the setting of this contribution claim. We hold that plaintiff property owners or other responsible parties are permitted to file contribution claims in Superior Court, and a court may allocate liability before the final resolution of a site remediation plan by the DEP.

First, dischargers statutorily are afforded the same right as the DEP to sue other potentially responsible parties in order to recover contribution costs for contamination where other parties caused a portion of the discharge. There is no question that the DEP has the authority to sue "any party responsible" for cleanup costs following the DEP's remediation of a site. See N.J. Dep't. of Envtl. Prot. v. Dimant, 212 N.J. 153, 159 (2012) (finding that to recover costs from responsible party, DEP must show reasonable nexus between discharge, discharger and contamination at the damaged site). At the time of filing, and anytime as permitted by Rule 4:29-1, the DEP may join as defendants in the suit as many or as few potentially responsible parties as the agency deems necessary. N.J.S.A. 58:10-23.11g(c). Because the DEP may join a party at the onset of a claim, prior to determining the full extent of the contamination, it follows that a private entity is granted that

21

same right to hold a responsible party accountable through a contribution claim. To deny this right would be fundamentally unfair, especially where the contribution plaintiff could be liable for a substantial amount of cleanup costs, even when not entirely -- or even substantially -- responsible for the contamination.

Additionally, the Spill Act gives the court, not the DEP, jurisdiction over contribution claims. N.J.S.A. 58:10-23.11f(a)(2)(a). For example, if the DEP initiates administrative proceedings against a discharger for contamination of land, a discharger is permitted to file a contribution claim so that the court can assign liability among the potentially responsible parties. In such situations, because the Legislature did not intend for private parties to use the DEP as a forum to bring contribution claims, the only recourse private-party dischargers have to obtain contribution from other responsible parties is in the Superior Court. Just as the CCC was not an appropriate place to bring common-law claims against casinos, Campione, supra, 155 N.J. at 262, here, the DEP is not the proper venue for dischargers to bring contribution claims. Through the Spill Act, the Legislature instructed that contribution claims should be filed in the Superior Court. See N.J.S.A. 58:10-23.11f(a)(2)(a).

In its August 21, 2003 letter to Magic, the DEP implicitly conceded that a claim for contribution, and specifically the

allocation of liability, is a form of recourse not within the DEP's jurisdiction. In that letter, the DEP expressly directed that the determination of the percentage of liability is best resolved either between the parties or "before the [c]ourt." Thus, the DEP clarified that the agency was not the proper forum in which to debate or distribute liability among potentially responsible parties.

Moreover, contribution claims do not necessitate the expertise of the DEP. A contribution claim allocates liability. Assigning liability is a matter within the conventional experience of judges. Judges are tasked with assigning liability in related Spill Act cases where the DEP sues a party responsible for contamination of a site to recover cleanup costs. Both in contribution cases and in general Spill Act litigation, there is no question that the trial court may engage in allocating a percentage of liability based on the factual and expert proofs regarding the presence and volume of contaminants on the land and the origin of those contaminants.

Additionally, the testimony of expert witnesses is both a necessary aspect of the contribution case, integral to proving liability, and a trial component with which judges are intimately familiar. Thus, although the contribution claim contains factors within the purview of the DEP, DEP expertise is not essential in reaching a final decision on liability allocation.

23

Therefore, it follows that the DEP and the courts share concurrent jurisdiction over the recovery of cleanup costs. Private parties are required to turn to the courts to seek contribution from other entities that caused contamination on the land in the form of a percentage of liability. Ultimately, the final determination of costs will be dictated by the remediation project and overseen by the DEP and the LSRPs.

Finally, it would be contrary to the stated goals of the Spill Act -- which promotes prompt remediation -- to force a discharger to bear the burden of the entire cleanup cost until such time as the remediation is fully complete. The completion of a site's remediation may take many years and could involve substantial expenses. To force one party to shoulder such an amount could prevent remediation from proceeding promptly by generating a disincentive for the party to put forth the financial contribution. Similarly, compelling one party to pay all the cleanup costs would be inimical to the stated goals of the Spill Act, particularly when that one party was not entirely at fault for all of the contamination. Therefore, we hold that a party determined to be a discharger and held responsible for the cost of cleanup by the DEP is entitled to bring a contribution claim against other potentially responsible parties before the final tally of cleanup costs. Such a determination is consistent with the Legislature's intent to encourage expeditious and efficient remediation of site contamination.

24

We next turn our attention to whether the DEP's written approval of the investigation and remediation plan is needed prior to filing a claim for contribution. We conclude that it is not. We base this decision on the plain language of the statute and the clear Legislative intent to amend the Spill Act to clarify and permit a private claim for contribution.

ExxonMobil maintains that N.J.S.A. 58:10-23.11f(a)(2)(a) permits parties to only recover "clean up and removal costs" in a contribution claim. N.J.S.A. 59:10-23.11f(a) provides that,

> [w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.
>
> [N.J.S.A. 58:10-23.11f(a) (emphasis added).]

The Legislature defines "cleanup and removal costs" as

> all direct costs associated with a discharge, . . . incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances.
>
> [N.J.S.A. 58:10-23.11b (emphasis added).]

Accordingly, ExxonMobil asserts that Magic cannot recover for contribution expenses until Magic has "written approval from the department." We disagree.

25

The Legislature was clear in instructing contribution plaintiffs on the necessary proofs to succeed on a claim for contribution, dictating that plaintiffs need only to prove that a contribution defendant is liable for a discharge under the Spill Act in order to prevail on a claim. N.J.S.A. 58:10-23.11f(a)(2)(a). ("In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A. 58:10-23.11g(c)], and the contribution defendant shall have only the defenses to liability available to parties pursuant to [N.J.S.A. 58:10-23.11g(d)].").

Thus, the argument in favor of requiring written approval of a remediation plan is of no moment in this case. The issue of allocation of liability is independent from the issue of the total amount of the costs. N.J.S.A. 58:10-23.11f(a)(2)(a) does not address the final determination of costs, only the allocation of liability. Magic is not requesting that the court assign a final allocation of cleanup costs. Rather, Magic is only seeking that the court assign a percentage of liability, a determination that does not require DEP approval.

According to the plain language of the statute, it is clear that N.J.S.A. 58:10-23.11f(a)(2)(a) limits cleanup and removal costs to only those costs approved by the DEP. However, the provision does not pertain to the allocation of those costs.

26

While dischargers are required to have written approval for the actual expenses that they incur for the purpose of remediation in order to seek contribution for those expenses, that is not a prerequisite to allocation of responsibility for the costs associated with the approved remediation.

Mandating written approval prior to the filing of a contribution claim would thwart the purpose of allowing contribution claims, which the Legislature explained was to encourage expeditious and efficient remediation. See Statement to S. Substitute S. No. 2657, supra, at 1-2. Forcing contribution plaintiffs to obtain written approval from the DEP would lengthen the cleanup process and discourage parties from cooperating with the DEP.

Therefore, we hold that written approval for the remediation plan is not required prior to filing a contribution claim.

VI.

The judgment of the Appellate Division is reversed and the case is remanded for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, and ALBIN, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE PATTERSON did not participate.

27

SUPREME COURT OF NEW JERSEY

NO.     A-46                          SEPTEMBER TERM 2012

ON CERTIFICATION TO        Appellate Division, Superior Court

MAGIC PETROLEUM CORPORATION,
        Plaintiff-Appellant,

                v.

EXXON MOBIL CORPORATION and
MARIE TIRICO,
        Defendants-Respondents,

                and

TRENTON OIL COMPANY and M.M.
WERTHEIM CORPORATION,
        Defendants,

                and

EXXON MOBIL CORPORATION,
        Defendant/Third-Party
        Plaintiff-Respondent,

                v.

LINKING RING PETROLEUM,
        Third-Party Defendant.


DECIDED          July 28, 2014
                 Chief Justice Rabner                    PRESIDING
OPINION BY          Justice Fernandez-Vina
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | ---------------------- | --------------------- |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |

1