**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1906-19

MORRIS COUNTY,

     Plaintiff-Appellant,

v.

STATE OF NEW JERSEY,
DEPARTMENT OF HUMAN
SERVICES,

     Defendant-Respondent.

_____

Argued February 23, 2021 – Decided July 27, 2021

Before Judges Fisher, Gilson, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0684-19.

Dennis Driscoll argued the cause for appellant (Inglesino, Webster, Wyciskala & Taylor, LLC, attorneys; Lisa D. Taylor and Joseph M. Franck, of counsel and on the briefs).

Christopher J. Riggs, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christopher J. Riggs and

Arundhati Mohankumar, Deputy Attorney General, on the brief).

PER CURIAM

In this case concerning the redistribution of federal Medicaid funds, plaintiff Morris County appeals orders divesting the court of jurisdiction and transferring the matter to defendant State of New Jersey, Department of Human Services (DHS). We affirm the aspect of the orders transferring plaintiff's claim for review by the DHS but reverse the divestiture of jurisdiction because the motion judge erred in not retaining jurisdiction and staying the case pending the DHS's review.

I.

Because the case comes to us as a result of defendant's motion to dismiss, we assume as true the facts alleged by plaintiff and give plaintiff "the benefit of all inferences that may be drawn from those facts." Feinberg v. N.J. Dep't of Env't Prot., 137 N.J. 126, 129 (1994); see also Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021).

Medicaid is a "joint federal-state program . . . established by Title XIX of the Social Security Act to provide medical assistance on behalf of certain categories of persons whose income and resources are insufficient to meet the costs of necessary medical services." In re Hosps.' Petitions for Adjustment of

2

Rates for Reimbursement of Inpatient Servs. to Medicaid Beneficiaries, 383 N.J. Super. 219, 227 (App. Div. 2006) (citing 42 U.S.C. § 1396, §§ 1396a to 1396v). The Medicaid program is administered federally by the United States Department of Health and Human Services (USDHHS) and in New Jersey by DHS through the Division of Medical Assistance and Health Services (DMAHS). Id. at 227-28 (citing 42 U.S.C. § 1396a(a)(5); N.J.S.A. 30:4D-4, -5, and -7).

Plaintiff contributes to New Jersey's share of Medicaid expenditures pursuant to the State's approved Medicaid plan. Plaintiff also provides social services to its residents, by the support of psychiatric services and, until the end of 2017, the operation of a skilled nursing facility called Morris View Healthcare Center (Morris View). Those services are funded by Medicaid monies received from the state and federal governments and taxes assessed by plaintiff. Thus, plaintiff is both a political subdivision that contributes to the State's share of Medicaid expenditures and a county health-care provider.

Following the economic downturn of 2008, Congress enacted the American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111-5, 123 Stat. 115 (2009). The purpose of the ARRA, among other things, was to "stabilize State and local government budgets . . . to minimize and avoid

3

reductions in essential services," "provide fiscal relief to States in a period of economic downturn," and "protect and maintain State Medicaid programs . . . including by helping to avert cuts to provider payment rates and benefits or services." Id. § 3(a)(5), § 5000(a)(1) to (a)(2). ARRA increased federal Medicaid assistance to the states by temporarily increasing the federal government's share of most Medicaid expenditures, first from October 1, 2008, to December 31, 2010 (recession-adjustment period), and then to June 30, 2011 (extension period). To be eligible for that increased assistance, states could not require political subdivisions, such as counties, to pay a greater percentage of the non-federal share of Medicaid expenditures during the recession-adjustment period than had been required in the previous twelve-month period (base period). That eligibility qualification has been called "the political subdivision requirement." As a result of the increase in the federal share, New Jersey received approximately $2.1 billion dollars in additional Medicaid funding.

In July 2014, the Office of Inspector General (OIG) of the USDHHS released a report in which it found New Jersey had not complied with the political subdivision requirement, meaning New Jersey's political subdivisions contributed a greater percentage of the non-federal share of Medicaid expenditures during the recession-adjustment period than they had during the

A-1906-19

base period. According to the OIG, to comply, New Jersey had to redistribute approximately $45.2 million dollars to its political subdivisions. Of that amount, the OIG concluded the State had to redistribute $20,883,357 for county nursing facility expenditures, with $1,869,357 attributed to plaintiff. The OIG's report covered only the recession-adjustment period; the OIG recommended DHS work with the Centers for Medicare & Medicaid Services (CMS), which is part of USDHHS, to ensure it had complied with the political subdivision requirement during the extension period.

New Jersey contested the OIG's findings. In a follow-up review dated May 23, 2016, CMS upheld $37,320,359 of the OIG's recommended redistribution amount, including all the county nursing facility redistribution amount. CMS advised DHS that if New Jersey did not agree to perform the redistribution, CMS would initiate disallowance of the entire amount of enhanced funding provided to the State.

## II.

In November 2018,[1] plaintiff filed a complaint in which it alleged the State owed it nearly $22 million dollars. First, acknowledging it had received

---

[1] According to plaintiff, a prior complaint it had filed in 2016 was dismissed in 2017 based on on-going communications between the State and CMS, updated

A-1906-19

$2,056,439.94 in redistributed funds from the State, plaintiff alleged the State still owed it $383,654.06 out of $570,737 in funds to which plaintiff claimed it was entitled due to the State's noncompliance with the political subdivision requirement during the ARRA extension period. Second, plaintiff alleged the State had issued a "recoupment schedule" in June 2017 based on a 2006 audit related to Morris View and indicated that beginning in August 2017 the State would begin recoupment of $1,661,594.37 from plaintiff, which, according to plaintiff, "effectively reduces the County's Medicaid rate for 2007 through 2017." Plaintiff asserted that recoupment would impact the calculations in the OIG report such that the State owed it at least $145,537 more than what the OIG had found.[2]

---

calculations the State had submitted to CMS on July 12, 2016, and the exhaustion-of-administrative-remedies doctrine.

[2] Plaintiff also made claims regarding funds allegedly due to it pursuant to its "Enhanced Peer Grouping under the State's Medicaid Plan." In response to the initial transfer order, defendant proposed to transfer those claims to the Office of Administrative Law as a contested case for a fair hearing. At the end of a subsequent case management conference, plaintiff's counsel asked for reinstatement of claims related to ARRA, not Enhanced Peer Grouping; the parties did not raise arguments about the Enhanced Peer Grouping in their appellate briefs; and counsel during oral argument stated it was not at issue. Accordingly, we do not address the Enhanced Peer Grouping claims.

A-1906-19

Plaintiff pleaded claims for "account stated," "recapture" for "wrongful detention of the County's property," conversion, and declaratory judgment as to the amount owed to it; and demanded payment of the amount allegedly due, "loss of use" damages, punitive damages, and attorneys' fees. Plaintiff also demanded a trial by jury.

Defendant moved to transfer venue to Mercer County and to dismiss the complaint with prejudice. On March 26, 2019, defendant's motion to transfer venue was granted. A Mercer County judge subsequently heard oral argument on the motion to dismiss. After defense counsel had argued the case should be dismissed because plaintiff did not have a private right of action and defendant had sovereign immunity, the motion judge questioned the "essence of the cause of action" asserted by plaintiff and whether administrative remedies were available on each of plaintiff's claims. She directed plaintiff to amend the complaint and both parties to submit additional briefing.

Plaintiff amended its complaint, pleading conversion based on defendant's alleged retention of funds owed to plaintiff due to defendant's noncompliance with the political subdivision requirement during the ARRA extension period and recoupment of funds related to the 2006 audit; breach of contract by failing to make proper Medicaid contributions and payments pursuant to a Medicaid

provider agreement; and breach of the implied covenant of good faith and fair dealing by depriving plaintiff of reimbursement owed to it and causing it to make excess contributions.[3] Plaintiff again sought a declaratory judgment as to the amount owed to it, punitive damages, "loss of use" damages, compensatory damages, and attorneys' fees and again demanded a trial by jury.

After hearing oral argument, the motion judge rendered her decision. Due to "the complexity of Medicaid" and DHS's expertise, because the case involved "County shares and State shares that are determined based upon some complex system that's beyond the four corners of this [c]omplaint," and because she viewed plaintiff's contract and tort claims as "an attempt to shoehorn" claims about the State's "administration of the Medicaid Program" and ARRA "into common-law causes of action," the motion judge found a contract or conversion action was not "the appropriate way" to adjudicate plaintiff's claim; "rather, . . . it's to go through the [a]gency and require the [a]gency . . . to provide . . . the avenue for relief that is represented." Believing "there just has to be the application of [a]gency expertise here" and that the case "crie[d] out for administrative remedy," the motion judge concluded "the appropriate thing to

---

[3] Plaintiff also pleaded violations of the Open Public Records Act, N.J.S.A. 47:1A-1 to -13, and the common law right of access but later withdrew those claims.

do . . . is a transfer to the [a]gency" with a direction that it "provide . . . a decision or an analysis . . . to the County that explains the basis for the amount of money that [it] got." She explained "while the [a]gency is not going to . . . decide a [c]ontract claim or a tort claim, the [a]gency will be looking to the substance of . . . these claims in terms of the money that the County is seeking to recover, and will . . . provide the [c]ourt with . . . its position in regard [to whether] . . . there [are] [a]gency avenues of relief . . . ."

The motion judge issued an order transferring plaintiff's claims to the Commissioner of DHS "for administrative review"; retaining jurisdiction "to ensure that a viable administrative mechanism exists to address" plaintiff's claims; and directing DHS to "review the substance of [p]laintiff's claims in terms of the additional moneys that [plaintiff] alleges is due to it by the State" and to provide "either an explanation of its rulings regarding the moneys claimed by the County, or a description of the administrative process [DHS] will follow in reviewing the County's claims," its calculations regarding ARRA fund distributions, and an explanation regarding how it intended to address plaintiff's assertion the 2006 audit recoupment would impact the amount allegedly due to plaintiff. The motion judge scheduled a case management conference, giving plaintiff an opportunity to raise concerns about "the viability of administrative

remedies" proposed by DHS and to ask her to restore counts of the amended complaint.

In a subsequent letter, defense counsel stated DHS would "afford [plaintiff] with administrative processes to pursue its claims," by referring plaintiff's ARRA claim to DMAHS for a final agency decision. Plaintiff objected to the proposed administrative process and asked the motion judge to restore the amended complaint. Plaintiff argued defendant had no authority to support the existence of any available administrative process but instead was "clearly attempting to create an arbitrary and unreasonable artificial administrative process on an ad hoc basis."

The motion judge conducted a case management conference during which she heard the parties' arguments concerning the proposed administrative process. Not dissuaded from her original conclusion that "the matter is an administrative one that needs to be reviewed by the [a]gency," the motion judge found DHS had "the flexibility to create an administrative remedy" and stated she was "comfortable that the State has offered [plaintiff] a mechanism by which [it] should be able to get an answer." She subsequently issued an order reaffirming the transfer of the complaint and divesting the court of jurisdiction.

10

III.

Plaintiff appeals, contending the court erred by misapplying the motion-to-dismiss standard by failing to give all reasonable inferences to plaintiff and by transferring the case "without dispositive authority"; by applying the primary-jurisdiction doctrine; and by applying the exhaustion-of-administrative-remedies doctrine.

Defendant argues the motion judge properly transferred the case because regardless of how plaintiff styled its claims, it was seeking relief from DHS's allocation of Medicaid funds – a claim best suited to be addressed by the state agency that administers the Medicaid program. Defendant also contends the transfer was proper because plaintiff failed to exhaust its administrative remedies and the motion judge correctly found DHS had flexibility under its enabling statute to respond to a Medicaid allocation dispute and create an administrative remedy, even though explicit regulations for an administrative remedy did not exist.

A.

We review de novo a trial court's legal conclusions. Clark v. Nenna, 465 N.J. Super. 505, 511 (App. Div. 2020). Thus, although a trial court's initial decision to invoke primary jurisdiction may be discretionary in nature, Est. of

11                                                                    A-1906-19

Kotsovska v. Liebman, 221 N.J. 568, 588 (2015), we owe no deference to a trial court's determination of legal questions concerning whether the court or another entity has primary jurisdiction, Muise v. GPU, Inc., 332 N.J. Super. 140, 157 (App. Div. 2000).

The primary-jurisdiction doctrine applies "when a case is properly filed in the Superior Court but the court declines original jurisdiction, referring specific issues to the appropriate administrative body." Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 405 (2014); see also Kotsovska, 221 N.J. at 588. As our Supreme Court acknowledged, "no formula exists to evaluate the applicability of primary jurisdiction." Id. at 407. Courts, nevertheless, have been guided by the following factors:

> 1) whether the matter at issue is within the conventional experience of judges; 2) whether the matter is peculiarly within the agency's discretion, or requires agency expertise; 3) whether inconsistent rulings might pose the danger of disrupting the statutory scheme; and 4) whether prior application has been made to the agency.
>
> [Boldt v. Correspondence Mgmt., Inc., 320 N.J. Super. 74, 85 (App. Div. 1999).]

See also Kotsovska, 221 N.J. at 588. The primary-jurisdiction doctrine applies when "disputed factual issues should be evaluated by the agency because of its expertise, but legal issues should be left to the court to decide." Magic

12

Petroleum, 218 N.J. at 406; see also Boss v. Rockland Elec. Co., 95 N.J. 33, 41 (1983) (finding "when the determination of the legal issue must be preceded by 'the taking of the necessary evidence and the making of the necessary factual findings,' it is best done by the administrative agency specifically equipped to inquire into the facts") (quoting Roadway Express, Inc. v. Kingsley, 37 N.J. 136, 140 (1962)).

The exhaustion-of-administrative-remedies doctrine is "designed to allow administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the courts." Brunetti v. Borough of New Milford, 68 N.J. 576, 588 (1975); see also In re Request to Modify Prison Sentences, 242 N.J. 357, 379 (2020). The exhaustion doctrine is applied:

> when it will ensure a claim will initially be heard by a body possessing expertise, when it allows for the creation of a factual record that will promote for meaningful appellate review, or when it fosters a potential for terminating the controversy, since an agency decision might satisfy the parties and obviate resort to the courts.
>
> [Rosenstein v. State, Dep't of Treasury, Div. of Pensions & Benefits, 438 N.J. Super. 491, 498 (App. Div. 2014).]

A court considering whether to apply the doctrine should consider whether its application would be "'futile' or might result in irreparable harm, or whether 'an

overriding public interest calls for a prompt judicial decision.'" Id. at 498-99 (quoting Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 561 (1979)). Futility includes when administrative remedies are inadequate or non-existent. Warrenville Plaza, Inc. v. Warren Twp. Sewerage Auth., 230 N.J. Super. 461, 465 (App. Div. 1989) (finding exhaustion doctrine "rests on the premise that such remedies are 'certainly available and completely adequate to right the wrong complained of'") (quoting Abbott v. Burke, 195 N.J. Super. 59, 73 (App. Div. 1984), rev'd on other grounds, 100 N.J. 269 (1985)).

The primary-jurisdiction and exhaustion doctrines are "doctrinally-related." Boss, 95 N.J. at 40; see also Muise, 332 N.J. Super. at 158. Both further the goals of assuring controversies are resolved in appropriate forums and maintaining proper relationships between administrative agencies and courts. Ibid. "In primary jurisdiction, 'the case is properly before the court, but agency expertise is required to resolve the questions present'; by contrast, when a court relies on exhaustion, it 'is saying that the case ought to have been brought before the administrative agency in the first place.'" Muise, 332 N.J. Super. at 159 (quoting Boldt, 320 N.J. Super. at 83-84); see also Curzi v. Raub, 415 N.J. Super. 1, 20 (App. Div. 2010).

The procedure a trial court should follow under either doctrine is clear. As we recently stated in Estate of Burns v. Care One at Stanwick, LLC, ___ N.J. Super. ____, ____ (App. Div. 2021) (slip op. at 21),

> When the claim itself falls within the agency's exclusive jurisdiction, it is subject to dismissal because of the failure to exhaust administrative remedies. But, when a court has jurisdiction over the claim and a pivotal aspect presents a question falling within an agency's expertise, a court will retain jurisdiction, stay the action, and allow for the agency's determination of that aspect.

See also Muise, 332 N.J. Super. at 161 (finding "[w]hen a claim presents some issues that are within an agency's special expertise and others which are not, the proper course is for the court to refer the former to the agency, and then to apply the agency's findings or conclusions to its determination of the remaining issues"). Thus, a court applying the exhaustion doctrine does not retain jurisdiction; a court applying the primary-jurisdiction doctrine "retains jurisdiction but defers action until the agency has reviewed the case and employed its expertise." Magic Petroleum, 218 N.J. at 405; see, e.g., Boss, 95 N.J. at 41-42 (Court remanded, instructing trial court to refer issue to agency for fact finding and then to apply fact finding to legal issues to be resolved by trial court); Boldt, 320 N.J. Super. at 87-88 (finding factual issue should be referred

15

to agency with trial court applying agency's findings to the plaintiff's legal claims).

## IV.

In an apparent attempt to find a creative solution to the complex and nuanced case before her, the motion judge, without specifically referencing either doctrine, conflated elements of the primary-jurisdiction and exhaustion doctrines to transfer and effectively dismiss the case. Although she appropriately transferred the case to the DHS for factual findings and calculations within its expertise regarding the State's compliance with ARRA's political subdivision requirement, she erred in not retaining jurisdiction so that the court ultimately could apply those factual findings to plaintiff's legal claims.

In preparing its report, the OIG considered only the ARRA recession-adjustment period. As alleged by plaintiff, the OIG did not consider the impact, if any, the recoupment based on the 2006 audit may have had on its calculations regarding the recession-adjustment period. The OIG expressly did not make any calculations regarding the extension period of ARRA; instead, it recommended

A-1906-19

DHS work with CMS to ensure the State had complied with ARRA's political subdivision requirement during the extension period.[4]

Plaintiff's remaining causes of action are premised directly on a determination of whether the 2006 audit recoupment alters the OIG's calculations regarding the State's compliance with the political subdivision requirement during the recession-adjustment period and on the preparation of calculations regarding whether the State complied with the political subdivision requirement during the extension period. As the motion judge recognized, to adjudicate plaintiff's common-law causes of action, the court would have to "get into calculations . . . that the Federal Government made . . . in the first instance, and then, apparently, subsequent to the materials [provided] to me . . . in regard to the extension period." We can understand why the motion judge believed she was being asked "to step in almost to the role of the Federal Government" to determine the State's compliance with the political subdivision requirement and viewed those necessary calculations as outside the expertise of the court and

---

[4] Plaintiff did not make any allegations in its amended complaint regarding the results, if any, of that collaboration, perhaps because it was not provided with any information about it. Thus, for example, we do not know if the State and CMS reached agreement on calculations and redistribution amounts for the extension period or whether any agreed-upon figures factored into the State's redistribution of $2,056,439.94 to plaintiff.

A-1906-19

within the expertise of the DMAHS. As "the 'single State agency' responsible for administering New Jersey's Medicaid program," DMAHS's expertise is clear. In re A.N., 430 N.J. Super. 235, 243 (App. Div. 2013) (quoting N.J.S.A. 30:4D-5); see also N.J.A.C. 10:49-1.1.

In transferring the case and divesting the court of jurisdiction, the motion judge appeared to be applying the exhaustion doctrine. That was an error because no administrative remedies were available until after the motion judge transferred the case and ordered defendant to review plaintiff's claims regarding moneys allegedly due to it and to provide either an explanation of its rulings or a description of the administrative process it would follow in reviewing plaintiff's claims. A court can't transfer and dismiss a case for failure to exhaust administrative remedies when the remedies don't exist. See Brunetti, 68 N.J. at 589 n.12; Warrenville Plaza, 230 N.J. Super. at 465.

The circumstances of this case are more closely aligned with the primary-jurisdiction doctrine. Calculations and factual determinations regarding whether the State complied with ARRA's political subdivision requirement during the extension period and whether and how the 2006 audit recoupment impacts the OIG's prior calculations and findings concerning the State's compliance with the political subdivision requirement during the recession-

adjustment period is not within the "conventional experience" of judges and falls more particularly in DMAHS's expertise. See Kotsovska, 221 N.J. at 588. Given that plaintiff's claims involve the potential redistribution of a portion of the $2.1 billion dollars in additional Medicaid funding the State received as a result of ARRA, the potential impact of inconsistent rulings is a concern. See id. A "pivotal aspect" of plaintiff's claims is the underlying calculations and factual findings regarding the State's compliance with the political subdivision requirement during the extension period and the possible impact of the 2006 audit recoupment on the OIG's prior calculations. See Est. of Burns, ___ N.J. Super. at ____ (slip op. at 21). Accordingly, under the primary-jurisdiction doctrine, we see no error in the transfer of the case to the appropriate agency for a determination of those particular factual issues.

The motion judge erred in divesting the court's jurisdiction. By transferring for an evaluation of the underlying factual issues and then effectively dismissing the case, the motion judge closed the avenue to resolution of the "legal issues . . . left to the court to decide." Magic Petroleum, 218 N.J. at 406. And, consistent with the primary-jurisdiction doctrine, resolution of those legal issues ultimately is for the court.

19

Affirmed in part; reversed in part.  We remand for entry of an order that reinstates the amended complaint and the trial court's jurisdiction but also transfers the matter to DMAHS for proceedings consistent with the opinion and stays the trial court proceedings until the DMAHS renders the findings required for a complete disposition of plaintiff's amended complaint.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1906-19