**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2036-17
     A-2038-17

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
THE COMMISSIONER OF THE
NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
and THE ADMINISTRATOR OF
THE NEW JERSEY SPILL
COMPENSATION FUND,

  Plaintiffs,

v.

OCCIDENTAL CHEMICAL
CORPORATION,

  Defendant-Appellant,

and

MAXUS INTERNATIONAL ENERGY
COMPANY, YPF, S.A., YPF HOLDINGS,
INC., YPF INTERNATIONAL S.A. (f/k/a
YPF INTERNATIONAL LTD.) and
CLH HOLDINGS,

  Defendants,

and

REPSOL, S.A.,

      Defendant-Respondent,

and

JOSEPH J. FARNAN, JR., as Liquidating Trustee for the Maxus Liquidating Trust,

      Defendant/Intervenor-Appellant,

and

MAXUS ENERGY CORPORATION and TIERRA SOLUTIONS, INC.,

      Defendants-Third-Party
      Plaintiffs,

v.

3M COMPANY, A.C.C., INC., ACH FOOD COMPANIES, INC., ACTIVE OIL SERVICE, ADCO CHEMICAL COMPANY, AGC CHEMICALS AMERICAS, INC., ALDEN-LEEDS, INC., ALLIANCE CHEMICAL, INC., ALUMAX MILL PRODUCTS, INC., AMCOL REALTY, INC., AMERICAN INKS AND COATINGS CORPORATION, APEXICAL, INC., APOLAN INTERNATIONAL, INC., ARKEMA INC., ASHLAND, INC., ASHLAND INTERNATIONAL, HOLDINGS INC., ASSOCIATED AUTO BODY & TRUCKS, INC., ATLAS REFINERY, INC., AUTOMATIC ELECTRO-PLATING

2

CORP, AKZO NOBEL COATINGS, INC.,
BASF CATALYSTS, LLC, BASF
CONSTRUCTION CHEMICALS, INC.,
BASF CORPORATION, BAYER CORPORATION,
BEAZER EAST, INC., BELLVILLE INDUSTRIAL
CENTER, BENJAMIN MOORE & COMPANY,
BEROL CORPORATION, B-LINE TRUCKING,
INC., BORDEN & REMINGTON CORP., C.S.
OSBORNE & CO., CAMPBELL FOUNDRY
COMPANY, CASCHEM INC., CBS CORPORATION,
CELANSE, LTD, CHEMICAL COMPOUNDS, INC.,
COSMOPOLITAN GRAPHICS CORPORATION,
CIDA CORPORATION, COLTEC INDUSTRIES
INC., COLUMBIA TERMINALS, INC., COMO
TEXTILE PRINTS, INC., CONAGRA PANAMA,
INC., CONOPCO, INC., CONSOLIDATED RAIL
CORPORATION, COOK & DUNNPAINT
CORPORATION, COSAN CHEMICAL CORPORATION,
COVANTA ESSEX COMPANY, CRODA, INC.,
CRUCIDLE MATERIALS CORPORATION,
CURTIS WRIGHT CORPORATION, CWC INDUSTRIES,
INC., DARLING INERNATIONAL, INC., DAV ANNE
REALTY CO., DELEET MERCHANDISING
CORPORATION, DELVAL INK AND COLOR,
INCORPORATED, DILORENZO PROPERTIES
COMPANIES, L.P., E.I. DU PONT DE NEMOURS
 AND COMPANY, EASTMAN KODAK COMPANY,
EDEN WOOD CORPORATION, ELAN CHEMICAL
COMPANY, INC., EM SERGEANT PULP & CHEMICAL,
CO., EMERALD HILTON DAVIS, LLC, ESSEX
 CHEMICAL CORPORATION, EXXON MOBIL,
F.E.R. PLATING, INC., FINE ORGANICS CORPORATION,
FISKE BROTHERS REFINING COMPANY, FLEXON
INDUSTRIES CORPORATION, FLINT GROUP
INCORPORATED, FORT JAMES INCOPORATED,
FOUNDRY STREET CORPORATION,
FRANKLIN-BURLINGTON PLASTICS, INC.,
GARFIELDMOLDING COMPANY, INC.,
GENERAL CABLE INDUSTRIES, INC.,

3

GENERAL DYNAMICS CORPORATION,
GENERAL ELECTRIC COMPANY, GENTEK
HOLDING LLC, GIVAUDAN FRAGRANCES
CORPORATION, G.J. CHEMICAL CO.,
GOODY PRODUCTS, INC., GORDON TERMINAL
SERVICE CO., OF N.J., INC., HARRISON SUPPLY
COMPANY, HARTZ MOUNTAIN CORPORATION,
HAVENICK ASSOCIATES, L.P., HEXCEL
CORPORATION, HEXION SPECIALTY CHEMICALS,
INC., HOFFMAN-LA ROCHE INC., HONEYWELL
INTERNATIONAL, INC., HOUGHTON INTERNATIONAL,
INC., HUDSON TOOL & DIE COMPANY, INC.,
HY-GRADE ELECTROPLATING CO., ICI AMERICAS
INC., INNOSPEC ACTIVE CHEMICALS LLC,
INX INTERNATIONAL INK CO., ISP CHEMICALS
INC., IT CORPORATION, KEARNY SMELTING
& REFINING CORP., KAO BRANDS COMPANY,
KOEHLER-BRIGHT STAR, INC., LINDDE, INC.,
LUCENT TECHNOLOGIES, INC., MACE ADHESIVES
& COATINGS COMPANY, INC., MALLINCKRODT INC.,
MERCK & CO., INC., METAL MANAGEMENT
NORTHEAST, INC., MI HOLDINGS, INC., MILLER
ENVIRONMENTAL GROUP, INC., MORTON
INTERNATIONAL, INC., N L INDUSTRIES, INC.,
NAPPWOOD LAND CORPORATION, NATIONAL
FUEL OIL, INC., NATIONAL-STANDARD, LLC,
NELL-JOY INDUSTRIES, INC., NESTLE U.S.A., INC.,
NEW JERSEY TRANSIT CORPORATION, NEWS
AMERICA INC., NEWS PUBLISHING AUSTRALIA
LIMITED, NORPAK CORPORATION, NOVELIS
CORPORATION, ORANGE AND ROCKLAND
UTILITIES, INC., OTIS ELEVATOR COMPANY,
PASSAIC PIONEERS PROPERTIES COMPANY,
PFIZER INC., PHARMACIA CORPORATION,
PHELPS DODGE INDUSTRIES, INC., PHILBRO,
INC., PITT-CON SOL CHEMICAL COMPANY,
PIVITAL UTILITY HOLDINGS, INC., PPG
INDUSTRIES, INC., PRC-DESOTO INTERNATIONAL,
INC., PRAXAIR, INC., PRECISION MANUFACTURING

4

GROUP, LLC, PRENTISS INCORPORATED, PROCTOR & GAMBLE MANUFACTURING COMPANY, PRYSMIAN COMMUNICATION CABLES AND SYSTEMS USA LLC, PSEG FOSSIL LLC, PUBLIC SERVICE ELECTRIC AND GAS COMPANY, PURDUE PHARMA TECHNOLOGIES, INC., QUALA SYSTEMS, INC., QUALITY CARRIERS, INC., RECKITT BENCKISER, INC., REICHOLD, INC., REVERE SMELTING & REFINING CORPORATION, REXAM BEVERAGE CAN COMPANY, ROMAN ASPHALT CORPORATION, ROYCE ASSOCIATES, A LIMITED PARTNERSHIP, R.T. VANDERBILT COMPANY, INC., RUTHERFORD CHEMICALS LLC, S&A REALTY ASSOCIATES, INC., SCHERING CORPORATION, SEQUA CORPORATION, SETON COMPANY, SIEMENS WATER TECHNOLOGIES CORP., SINGER SEWING COMPANY, SPECTRASERV, INC., STWB, INC., SUN CHEMICAL CORPORATION, SVP WORLDWIDE, LLC, TATE & LYLE INGREDIENTS AMERICAS, INC., TEV A PHARMACEUTICALS USA, INC., TEVAL CORP., TEXTRON, INC., THE DIAL CORPORATION, THE DUNDEE WATERPOWER AND LAND COMPANY, THE NEWARK GROUP, INC., THE OKONITE COMPANY, INC., THE SHERWIN-WILLIAMS COMPANY, THE STANLEY WORKS, THE VAL SPAR CORPORATION, THIRTY-THREE QUEEN REALTY, INC., THREE COUNTY VOLKSWAGEN CORPORATION, TIDEWATER BALING CORP., TIFFANY & CO., TIMCO, INC., TRIMAX BUILDING PRODUCTS, INC., TROY CHEMICAL CORPORATION, UNIVERSAL OIL PRODUCTS COMPANY, V. OTTILIO & SONS, INC., VELSICOL CHEMICAL CORPORATION, VEOLIA ES TECHNICAL SOLUTIONS, L.L.C., VERTELLUS SPECIALTIES, INC., VITUSA CORP., VULCAN MATERIALS COMPANY, WAS TERMINALS CORPORATION, WAS TERMINALS, INC., W.C. INDUSTRIES, WHITTAKERCORPORATION, WIGGINS PLASTICS, INC., ZENECA INC., AMERICAN CYANAMID, BAYER CORPORATION,

BAYONNE INDUSTRIES, INC., BP MARINE AMERICAS, INC., CHEMICAL WASTE MANAGEMENT, INC., DOW CHEMICAL COMPANY, DURAPORT REALTY ONE LLC, DURAPORT REALTY TWO LLC, EPEC POLYMERS, INC., GAESS ENVIRONMENTAL SERVICES INC., GATX TERMINALS CORPORATION, GOODRICH CORPORATION, HESS CORPORATION, IMTT-BAYONNE, KINDER MORGAN ENERGY, PARTNERS, L.P., MCKESSON CORPORATION, MCKESSON ENVIROSYSTEMS, CO., SAFETY-KLEEN CORPORATION, SHULTON, INCORPORATED, USA, SUN PIPELINE CO., SUN REFINING & MARKETING CO., SUN OIL CO., SUPERIOR MPM LLC, THOMAS & BETTS CORP., WASTE MANAGEMENT, INC., WYETH TRMI-H LLC, POWER TEST REALTY CO., GETTY PROPERTIES, CORP., GENERAL MOTORS CORP., CYTEC INDUSTRIES, INC., LEGACY VULCAN CORP., BAYONE MUNICIPAL UTILTIES AUTHORITY, BOROUGH OF CARTERET, BOROUGH OF EAST NEWARK, BOROUGH OF EAST RUTHERFORD, BOROUGH OF ELMWOOD PARK, BOROUGH OF FAIR LAWN, BOROUGH OF FANWOOD, BOROUGH OF FRANKLIN LAKES, BOROUGH OF GARWOOD, BOROUGH OF GLEN RIDGE, BOROUGH OF GLEN ROCK, BOROUGH OF HALEDON, BOROUGH OF HASBROUCK HEIGHTS, BOROUGH OF HAWTHORNE, BOROUGH OF KENILWORTH, BOROUGH OF LODI, BOROUGH OF MOUNTAINSIDE, BOROUGH OF NEW PROVIDENCE, BOROUGH OF NORTH ARLINGTON, BOROUGH OF NORTH CALDWELL, BOROUGH OF NORTH HALEDON, BOROUGH OF PROSPECT PARK, BOROUGH OF ROSELLE PARK, BOROUGH OF RUTHERFORD, BOROUGH OF TOTOWA, BOROUGH OF WALLINGFORD, BOROUGH OF WEST PATERSON, BOROUGH OF WOOD-RIDGE, CITY OF BAYONNE, CITY OF CLIFTON, CITY OF EAST ORANGE, CITY OF ELIZABETH, CITY OF GARFIELD, CITY OF HACKENSACK, CITY OF JERSEY CITY, CITY OF LINDEN, CITY OF NEWARK, CITY OF ORANGE, CITY OF PASSAIC, CITY OF

6

PATERSON, CITY OF RAHWAY, CITYOF SUMMIT,
CITY OF UNION CITY, HOUSING AUTHORITY
OF THE CITY OF NEWARK, JERSEY CITY
MUNICIPAL UTILITIES AUTHORITY, JOINT MEETING
 OF ESSEX AND UNION COUNTIES, LINDEN ROSELLE
SEWERAGE AUTHORITY, PASSAIC VALLEY
SEWERAGE COMMISSIONERS, PORT AUTHORITY OF
NEW YORK AND NEW JERSEY, RAHWAY VALLEY
SEWERAGE AUTHORITY, THE NEW JERSEY
DEPARTMENT OF AGRICULTURE, THE NEW JERSEY
DEPARTMENT OF TRANSPORTATION, THE STATE OF
NEW JERSEY, TOWNSHIP OF BELLEVILLE, TOWN
OF HARRISON, TOWN OF KEARNY, TOWN OF
NUTLEY, TOWN OF WOODBRIDGE, TOWNSHIP
OF BERKELY HEIGHTS, TOWNSHIP OF BLOOMFIELD,
TOWNSHIP OF CEDAR GROVE, TOWNSHIP OF CLARK,
TOWNSHIP OF WESTFIELD, TOWNSHIP OF CRANFORD,
TOWNSHIP OF HILLSIDE, TOWNSHIP OF IRVINGTON,
TOWNSHIP OF LITTLE FALLS, TOWNSHIP OF
LIVINGSTON, TOWNSHIP OF LYNDHURST,
TOWNSHIP OF MAPLEWOOD, TOWNSHIP OF MILLBURN,
TOWNSHIP OF MONTCLAIR, TOWNSHIP OF ORANGE,
TOWNSHIP OF SADDLE BROOK, TOWNSHIP OF SCOTCH
PLAINS, TOWNSHIP OF SOUTH HACKENSACK, TOWNSHIP
OF SOUTH ORANGE VILLAGE, TOWNSHIP OF SPRINGFIELD,
TOWNSHIP OF UNION, TOWNSHIP OF WEST ORANGE,
TOWNSHIP OF WINFIELD PARK, TOWNSHIP OF WYCOFF,
VILLAGE OF RIDGEWOOD,

    Third-Party Defendants.

Argued December 16, 2020 – Decided December 27, 2021

Before Judges Fuentes, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, Docket No. L-9868-05.

Kathy D. Patrick (Gibbs & Bruns, LLP) of the Texas and District of Columbia bars, admitted pro hac vice, argued the cause for appellant Occidental Chemical Corporation (Archer & Greiner, Kathy D. Patrick, Anthony N. Kaim (Gibbs and Bruns, LLP) of the Texas bar, admitted pro hac vice, Denise L. Drake (Gibbs and Bruns, LLP) of the Texas and California bars, admitted pro hac vice, and Ashley McKeand Kleber (Gibbs & Bruns, LLP) of the Texas bar, admitted pro hac vice, attorneys; Kathy D. Patrick and William J. Stack, of counsel and on the brief; Anthony N. Kaim, Denise L. Drake, Ashley McKeand and John J. McDermott, on the briefs).

J. Christopher Shore (White & Case, LLP) of the New York and Rhode Island bars, admitted pro hac vice, argued the cause for appellant Joseph J. Farnan, Jr., as liquidating trustee for the Maxus Liquidating Trust, (Pashman Stein Walder Hayden, and J. Christopher Shore, attorneys: Michael S. Stein, of counsel and on the briefs; David Cinotti and Timothy P. Malone on the briefs).

Diane P. Sullivan argued the cause for Repsol, S.A., (Weil, Gotshal & Manges LLP, attorneys; Diane P. Sullivan and Edward Soto, (Weil, Gotshal & Manges LLP) of the Florida and New York bars, admitted pro hac vice, on the briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

We consolidate these back-to-back appeals because they represent a continuation of the long-running environmental litigation concerning hazardous pollution in the Passaic River and Newark Bay Complex from a chemical

manufacturing facility in Newark. In 2005, plaintiffs, the Department of Environmental Protection (DEP) and other State agencies, filed suit against several corporate entities under the Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, other statutory schemes, and common law. These corporate entities in turn filed crossclaims, counterclaims, and third-party complaints. All defendants and third-party defendants eventually settled with plaintiffs.

At issue in these consolidated appeals are: (1) the crossclaims defendant Occidental Chemical Corporation (OCC) filed against defendant Repsol, S.A. (Repsol or Repsol-YPF, S.A.), alleging Repsol was an alter ego of its subsidiary -- defendant Maxus Energy Corporation (Maxus Energy) and its various affiliates (collectively, Maxus, unless individually named) -- upon which these defendants were found liable to OCC for environmental remediation and contract indemnification; and (2) the counterclaim Repsol filed against OCC, seeking contribution under the Spill Act.

The trial court ultimately found (i) Repsol, which settled with the government plaintiffs for $65 million, was not a Spill Act discharger or alter ego of Maxus; and (ii) OCC, which settled with the government plaintiffs for $160 million, was a discharger and, therefore, was jointly and severally liable to Repsol for $65 million in Spill Act contribution. Because Maxus filed for

federal bankruptcy, OCC's crossclaims against Maxus's affiliates and other defendants were transferred to the United States Bankruptcy Court for the District of Delaware. The bankruptcy court thereafter approved a plan of liquidation calling for a Liquidating Trust owned by the creditors of Maxus (Trust), and appointed Joseph J. Farnan, Jr., as the Maxus Liquidating Trustee (Trustee or intervenor).

In docket number A-2036-17, OCC argues the trial court erred when it granted summary judgment to Repsol on its Spill Act contribution counterclaim, and when it denied OCC's motion for leave to file a supplemental crossclaim against Repsol. In docket number A-2038-17, the Trustee, who intervened before the Law Division, argues the court erred when it dismissed OCC's crossclaims alleging alter ego liability against Repsol. The Trustee also seeks that we vacate the trial court's order dismissing OCC's fraudulent transfer crossclaims or, alternatively, to stay the execution of the order.

We reverse the trial court's holdings on alter ego liability in docket number A-2038-17 and on Spill Act contribution in docket number A-2036-17, and remand both cases. Although the court properly ruled on Delaware's alter-ego-liability law and necessary sequential veil piercing of a complex corporate organization, there are genuine issues of material fact that preclude summary judgment to Repsol on alter ego liability, especially with respect to the necessary

element of fraud. We reach the same conclusion on Repsol's contribution. Although the trial court properly determined the legal standard of liability for contribution under the Spill Act, there are genuine issues of material fact that preclude any grant of summary judgment to Repsol on contribution. The court also erred when it failed to consider the issue of contractual indemnification. Finally, we remand to allow OCC to make an appropriate application to the trial court to supplement its crossclaim in docket number A-2036-17.

I.

Historical Perspective

Between 1940 and 1951, Kolker Chemical Works purchased or leased a chemical plant located on Lister Avenue, in the City of Newark (Lister site), where it manufactured insecticides and herbicides. In 1951, Diamond Alkali Company purchased Kolker, including the Lister site. Diamond Alkali used the Lister site to manufacture chemicals, including DDT and Agent Orange.

In 1967, Diamond Alkali merged with Shamrock Oil and Gas Company. The then-newly formed company, Diamond Shamrock Company (old-DSC),[1] created the following divisions that were not separately incorporated: (1) a

---

[1] The parties referred to this company as "old-DSC." They also used similar appellations for other entities. We decided to adopt this approach in the interest of clarity.

chemical manufacturing division, which operated the Lister site until 1969; (2) an oil and gas exploration and production division; (3) an oil refining and marketing division; and (4) a coal production division.

In 1971, old-DSC sold the Lister site to a third party, Chemicaland Corp. Between November 22, 1976, and February 24, 1977, however, a predecessor to appellant OCC (old-OCC), assumed temporary management and operation of the Lister site's plant facilities. According to old-OCC's eastern division vice president and general manager, "all costs and expenses associated with the management of the plant which were incurred [during that time would] be settled by [OCC]." The Lister site was abandoned in February 1977. In April 1982, old-OCC changed its name to Occidental Chemical Agricultural Products, Inc.

From 1983 through 1984, old-DSC went through a corporate reorganization resulting in a new Delaware-incorporated parent holding company, also named Diamond Shamrock Corporation (DSC). DSC's management decided to form separate, wholly owned, operating subsidiaries for each of its business assets: (1) Diamond Shamrock Chemicals Company (DSCC), which conducted all of DSC's and old-DSC's chemical concerns; (2) Diamond Shamrock Refining and Marketing Company, which conducted DSC's refining and marketing; (3) Diamond Shamrock Coal Company; and (4)

12

Diamond Shamrock Corporate Company, which provided oversight and control of the Lister site.

In September 1984, the Lister site and surrounding properties were listed as federal superfund sites together with the Passaic River and Newark Bay. As noted by the courts in New Jersey Department of Environmental Protection v. Occidental Chemical Corp., No. A-0067-11 (App. Div. Apr. 24, 2012) (slip op. at 13), and Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co., 258 N.J. Super. 167, 213 (App. Div. 1992), it is undisputed that the owners or users of the chemical manufacturing site on Lister Avenue knew about the release of hazardous materials from the plant and the migration of these substances to the surrounding areas.

<u>The Stock Purchase Agreement - Creation of Corporations</u>

DSCC reacquired ownership of the abandoned Lister site in August 1986 and transferred it to Diamond Shamrock Chemical Land Holdings, Inc., an insolvent land holding company. Pursuant to a stock purchase agreement (SPA) dated September 4, 1986, DSC sold all its outstanding stock in DSCC and its chemical-related subsidiaries to Oxy-Diamond Alkali Corporation (Oxy-Diamond), a subsidiary of Occidental Petroleum Corporation (OPC). This agreement did not include sale of the Lister site.

The SPA was governed by Delaware's laws. It contained an indemnification clause whereby DSC agreed to indemnify, defend, and hold harmless the buyer for all losses, including any environmental remediation liabilities, arising out of a list of "Inactive Sites," which included the Lister site.

Section 9.03(a) of the SPA stated:

> Seller [DSC] shall indemnify, defend and hold harmless each of OPC, [Occidental Chemical Holding Corp.], Buyer [Oxi-Diamond], each of the DSCC Companies and each Pass-Through Purchaser, each of their respective subsidiaries and affiliates and each of their respective directors, officers, agents and representatives, from and against any and all claims, demands or suits (by any Entity, including, without limitation, any Governmental Agency), losses, liabilities, damages, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim . . . and whether for property damage, natural resource damage, . . . governmental fines or penalties . . . , pollution, threat to the environment, environmental remediation, or otherwise (individually and collectively "Indemnifiable Losses") relating to, resulting from or arising out of any of the following:
>
>     . . . .
>
> (iv) the "Inactive Sites" (which for purposes of this Agreement, shall mean those former chemical plants and commercial waste disposal sites listed on Schedule 9.03(a)(iv) and all other properties which were previously, but which, as of the Closing Date, are not, owned, leased, operated or used in connection with the business or operations of any Diamond Company, including, without limitation, any DSCC Company, or

A-2036-17

any predecessor-in-interest thereof), including, without limitation, any matter relating to any of the Inactive Sites for which (A) any Diamond Company (including, without limitation, any DSCC Company) on or prior to the Closing Date agreed to indemnify, defend or hold harmless any Entity, or (B) any Diamond Company may otherwise be held liable;

. . . .

(viii) the Historical Obligations and any other obligations or liabilities (absolute or contingent) of any Diamond Company (including, without limitation, any DSCC Company prior to the Closing) or any predecessor-in-interest thereof or of any DSCC Company unrelated to the Chemicals Business, including, without limitation, obligations and liabilities arising out of, resulting from or incurred in connection with, any ownership, use or operation of the business or assets of any Diamond Company other than a DSCC Company, whether before or after the Closing Date . . . .

. . . .

(b) Buyer shall indemnify, defend and hold harmless each of the Diamond Companies (other than the DSCC Companies) and each of their respective subsidiaries and affiliates . . . from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any of the following:

. . . .

(ii) any obligations or liabilities of Buyer or any subsidiary of Buyer (other than any DSCC Company) prior to the Closing Date . . . .

15

Also, Section 12.11 of the SPA required the seller, DSC, to use "its best efforts" to obtain a release from liability for each of the DSCC companies in any litigation involving sites covered by indemnification.

Finally, Section 12.03 (Successors) stated:

> This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties, except (a) that without any such prior written consent, Buyer may assign any or all of its rights, interests and obligations hereunder to any directly or indirectly wholly owned subsidiary of OPC, provided, however, that, any such subsidiary agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that each of Buyer, OPC and Oxy Chem shall remain liable under its respective obligations set forth in this Agreement . . . .

After the stock purchase in November 1987, DSCC changed its name to Occidental Electrochemicals Corp., and merged with Oxy-Diamond, forming OCC, a corporation organized under New York's laws with its principal place of business in Texas. Seven months earlier, in April 1987, DSC spun off the outstanding stock to its subsidiary, Diamond Shamrock Refining and Marketing Co., and changed its name to Maxus Energy, a corporation organized under the laws of Delaware with its principal place of business in Texas. DSC's Diamond

16

Shamrock Corporate Company thereafter changed its name to Maxus Corporate Company in 1988 and later merged into Maxus Energy.

At that time, Maxus shared the continuity of management, personnel, physical locations, assets, and general business operations with old-DSC, as well as a continuity of ownership and shareholders. Maxus operated as an independent international oil and gas exploration and production company from 1987 to 1995.

In the interim, Diamond Shamrock Chemical Land Holdings, Inc., owner of the Lister site, had changed its name to Chemical Land Holdings, Inc., and then to defendant Tierra Solutions, Inc. (Tierra), a corporation created by and affiliated with Maxus, a corporate entity organized under laws of Delaware, with its principal place of business in New Jersey. Tierra currently owns the Lister site. Maxus Energy and Tierra originally "spent nearly $240 million in projects associated with the investigation and remediation of the Lister Site . . . ." and its surrounding waterways.

In March 1995, defendant YPF, S.A., an Argentinian state-owned oil company, and its affiliates (collectively YPF, unless individually named), purchased Maxus in a cash tender sale with Maxus funding its own acquisition through a series of loan transactions owed to YPF. At that time, Maxus was a

"huge oil and gas exploration and production company with over $2.9 billion in total assets . . . and $860 million in stockholder equity."

Following its acquisition in 1996, Maxus underwent an internal global reorganization and began selling the common stock in its international oil and gas divisions to defendant YPF Holdings, Inc. (YPF Holdings), a new corporation created that year by YPF, S.A., and organized under the laws of Delaware. Three senior YPF executives sat on Maxus's eight-member board of directors. YPF Holdings then created a new Delaware corporation, defendant CLH Holdings, Inc. (CLH Holdings), which bought and held Tierra.

YPF, S.A., thereafter, replaced Maxus's commercial debt with $1.4 billion in YPF-held loans. Between 1996 and 1997, YPF, S.A., conducted a global restructuring, transferring Maxus's most valuable international exploration and production assets, including its assets in Bolivia, Venezuela, Ecuador, and Indonesia, to its own subsidiary holding company, defendant YPF International, Ltd. (YPF Int'l), incorporated in the Cayman Islands. These transfers decreased Maxus's assets from $2.9 billion to less than $1 billion and significantly reduced Maxus's revenue streams. YPF employed Maxus's personnel to manage the transferred assets through a new subsidiary, Maxus Management Group.

Repsol was created in 1987, when Spain merged two state-controlled oil companies and incorporated their divisions regarding exploration, refining,

petrochemicals and natural gas. Repsol was fully privatized in 1997. In 1999, Repsol purchased full control of YPF's stock. At that time, Maxus had $961 million in assets. The union of Repsol and YPF was named Repsol-YPF, S.A.

After the sale, Repsol caused YPF to direct Maxus to sell its remaining assets, including its interest in Crescendo Resources, Stormy Monday, and Tiger/North Bronto. This caused a ninety-eight percent decline in Maxus's total revenues. By 2009, Maxus consisted of: (1) Maxus Energy, whose only business operations were to collect revenue from its remaining onshore oil and gas royalty interests, comply with environmental remediation obligations, provide general and administrative services for its subsidiaries, and manage litigation on behalf of itself and OCC; (2) Tierra, whose business consisted solely of managing Maxus Energy's and its own environmental liabilities; and (3) various related special purpose entities, such as Maxus (U.S.) Exploration Company, which held a non-operating interest in the Neptune prospectus, a large European exploration and production company, and Gateway Coal Company, whose business was limited to the administration of retiree benefits for its former employees and their dependents.

From 2009 through early 2016, Maxus and Tierra became entirely dependent on Repsol for financial support to meet their daily obligations and environmental liabilities. Despite its inactivity, Maxus Energy met its

A-2036-17

environmental liability obligations under the SPA during this time. This ended in 2012, when the government of Argentina expropriated Repsol's interest in YPF.

## II.

### Underlying Environmental Litigation

In November 2005, plaintiffs brought this civil action against OCC, Repsol, YPF, Maxus, and Tierra pursuant to the Spill Act, the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -73, the New Jersey Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-20 to -36, and New Jersey's common law. Plaintiffs amended their complaint multiple times thereafter. Plaintiffs alleged DSC, its predecessors and successors, including OCC and/or Maxus, deliberately discharged hazardous chemicals from the Lister site into the surrounding waterways, and that Maxus, Tierra, YPF, and Repsol orchestrated and implemented a strategy to delay and impede the clean-up and strand the associated liabilities in Maxus and Tierra.

Plaintiffs further alleged Maxus and YPF devised a scheme, which was orchestrated and implemented through their subsidiaries and affiliated companies, and later by Repsol and its subsidiaries, "all acting as alter egos of one another," to transfer Maxus's valuable and most profitable assets and holdings to affiliated companies outside of Maxus's chain of ownership, thereby

20

leaving no independent ability to satisfy their environmental liabilities and causing damage to human health and the environment.

In October 2008, OCC filed a responsive pleading denying liability and asserting several affirmative defenses and crossclaims. Maxus and Tierra filed their own answers denying liability and asserting counterclaims, and four third-party complaints against approximately 250 public and private parties seeking contribution and other forms of relief pursuant to the Spill Act and the Joint Tortfeasors Contribution Law (JTCL), N.J.S.A. 2A:53A-1 to -5. They alleged the named third-party defendants also made hazardous discharges into the impacted areas and were thus liable in contribution to pay a proportionate, equitable share of damages. The third-party defendants filed answers denying liability and asserting various affirmative defenses.

The judge assigned to manage these complex, multifaceted cases organized the action into various phases and tracks, issued numerous case management orders, and appointed a special master. On July 19, 2011, the judge granted, in part, plaintiffs' motions for summary judgment against OCC and Maxus. The judge held only OCC was "strictly, jointly and severally liable under the [Spill Act] for all past cleanup and removal costs incurred by [p]laintiffs associated with the discharges of hazardous substances . . ." and "for all future cleanup and removal costs . . . ." In his oral decision, the judge found

undisputed that old-DSC and DSCC had discharged hazardous substances and were strictly liable to plaintiffs under the Spill Act, and OCC was "the undisputed legal . . . successor by merger with DSCC, [and] . . . they [were] responsible for the liabilities of [old-DSC]." However, the judge did not make any determinations concerning the types or quantities of hazardous substances that were discharged into the waterways, causation, or whether there was a nexus between releases from the Lister site and any contamination detected in the sediments or nearby waterways.

On August 24, 2011, the court granted OCC's motion for partial summary judgment against Maxus. The motion judge held Maxus was required to indemnify OCC "for any costs, losses and liabilities that may be incurred by [OCC]" as a result of its "acquisition of [DSCC]." In his oral decision, the judge found it was undisputed that OCC was the "successor" to DSCC's environmental Spill Act liability, which "would be the amount of indemnification" OCC could receive from Maxus, and that Tierra was also "strictly liable" for indemnification.

On May 21, 2012, the court: (1) denied summary judgment motions by plaintiffs and OCC seeking to establish that Maxus was a successor at law or in equity to Diamond Alkali, old-DSC, and/or DSCC; (2) granted plaintiffs' summary judgment motion, holding "Maxus [was] the alter ego of Tierra" and,

22

as a result, both were "a person in any way responsible under the Spill Act . . ." based solely on Tierra having acquired ownership of the Lister site in 1986; (3) denied plaintiffs' summary judgment motion seeking to establish that they had a direct claim against Maxus as third-party beneficiaries of the SPA or as the "bond, insurer or any other person providing evidence of financial responsibility" pursuant to N.J.S.A. 58:10-23.11s; (4) held that plaintiffs had "standing to enforce Maxus' indemnity obligations to OCC under the SPA"; and (5) granted plaintiffs' and OCC's summary judgment motions, holding that Maxus was a person "in any way responsible under the Spill Act" because it was the alter ego of Tierra.

OCC filed a second amended crossclaim in September 2012, seeking contractual and common law indemnification from all crossclaim defendants under the SPA pursuant to alter ego liability. It sought indemnification from Maxus under the same theories of liability because, as alter egos of each other, all crossclaim defendants constituted "a Cohesive Economic Unit." OCC sued Repsol and YPF for tortious interference, fraudulent transfers with contract, and unjust enrichment. OCC also sought contribution under the Spill Act against all crossclaim defendants, along with statutory contribution under the JTCL and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8. OCC further alleged a civil conspiracy stemming from Maxus's transfer of substantially all its assets

A-2036-17

to YPF affiliates, and later to Repsol affiliates. According to OCC, all crossclaim defendants contrived to isolate the environmental liabilities owed to OCC under the SPA. Finally, OCC claimed the crossclaim defendants breached their fiduciary duty, and included a derivative claim on behalf of insolvent Maxus against Repsol, YPF, YPF Holdings and YPF Int'l.

## III.

In December 2013, plaintiffs settled their causes of action and damage claims against Repsol, YPF, Maxus, Tierra, YPF Holdings, and YPF Int'l. As part of the court-approved settlement agreement, both Repsol and Maxus/YPF each agreed to pay $65 million, while preserving their statutory rights to seek contribution from OCC. That same year, plaintiffs also settled their claims against third-party defendants. In July 2014, OCC filed its third and fourth amended crossclaims, which were struck by the court in October 2014.

In December 2014, one year after plaintiffs settled with Repsol, YPF, and Maxus/Tierra, OCC entered into a consent judgment through which OCC agreed to pay $190 million.[2] The settlement did not provide OCC with any contribution protection. On December 14, 2014, the court approved the settlement and

---

[2] The $190 million settlement was payable in three installments: $70 million by January 15, 2015; $60 million by March 15, 2015; and $60 million by June 15, 2015.

dismissed plaintiffs' action against OCC. By 2015, all parties had settled with plaintiffs without admitting any fact, fault, or liability. Specifically, in addition to OCC, Repsol settled for $65 million; Maxus and/or YPF settled for $65 million; and the third-party defendants settled for tens of millions collectively.

On January 29, 2015, the court dismissed all of OCC's second amended crossclaims against Repsol, except the counts based on indemnification, alter ego liability, and contractual indemnification through alter ego liability. The indemnification count remained because the court granted OCC's motion for partial summary judgment on this claim in August 2011, and held Maxus was required to indemnify OCC. The court also found OCC's claims of breach-of-contract and indemnification, based on alter ego liability, had been sufficiently pleaded. The court, however, dismissed OCC's other crossclaims as untimely.

In February 2015, Repsol filed an answer to OCC's second amended crossclaim denying liability, raising affirmative defenses, and including two counts of counterclaims. Repsol alleged in its counterclaims: OCC owed Repsol contribution of $65 million under N.J.S.A. 58:10-23.11f(2)(a) of the Spill Act; and OCC was unjustly enriched when Repsol paid the $65 million settlement to plaintiffs.

On November 2, 2015, OCC moved for partial summary judgment on its indemnification crossclaim against Maxus, and for summary judgment to

dismiss Repsol's two-count counterclaim. Repsol responded and filed its own cross-motion to dismiss OCC's claims based on the alter ego of Maxus. OCC also sought leave to file a supplemental crossclaim against codefendants for tortious interference with Maxus's contractual obligation under the SPA to use its "best efforts" to obtain settlement releases for OCC.

Based on the recommendations of the special master, on April 5, 2016, the trial court: (1) granted OCC's motion for partial summary judgment against Maxus, holding OCC was entitled to indemnification from Maxus for its own conduct at the Lister site before it signed the SPA; (2) granted in part OCC's motion for summary judgment, dismissed Repsol's unjust enrichment counterclaim, and found Repsol was entitled to proceed with its Spill Act contribution claim; (3) granted Repsol's motion for summary judgment against OCC, dismissed the claims of alter ego liability, and held Repsol was not the alter ego of Maxus as a matter of law; (4) denied YPF's motion for summary judgment against OCC, declined to dismiss OCC's claims of alter ego liability against YPF in OCC's second amended crossclaim; and (5) denied OCC's motion for leave to file its supplemental crossclaim against codefendants. On May 27, 2016, Repsol moved for summary judgment on its Spill Act contribution counterclaim against OCC.

On June 17, 2016, the last business day before trial was scheduled to begin, Maxus, Tierra, and their subsidiaries and affiliates, filed for Chapter 11 bankruptcy. In re Maxus Energy Corp., 560 B.R. 111, 114-15 (Bankr. D. Del. 2016). On June 20, 2016, OCC moved in the bankruptcy court to transfer venue of the environmental litigation from the New Jersey court. At that point, the environmental litigation consisted of: (1) OCC's second amended crossclaim against YPF and Repsol, alleging they were alter egos of Maxus; and (2) Repsol's counterclaim against OCC for Spill Act contribution. On June 26, 2016, the bankruptcy court granted OCC's motion. On November 16, 2016, the bankruptcy court granted Repsol's motion to remand to the Law Division its contribution counterclaim against OCC and OCC's alter ego crossclaim against it. Id. at 129

On May 22, 2017, the bankruptcy court approved Maxus's Amended Plan of Liquidation with an effective date of July 14, 2017, and created the Trust to represent the interests of Maxus's creditors. In August 2017, the bankruptcy court ruled on all rights to pursue the claims belonging to Maxus and its affiliated debtors. OCC's crossclaims against Repsol were an asset of Maxus's bankruptcy estate and passed to the Trust as of the date of bankruptcy. Thus, the Trust had standing to sue on those claims.

A-2036-17

On October 19, 2017, the court granted Repsol's motion for summary judgment on its Spill Act contribution counterclaim against OCC and ordered OCC to pay Repsol $65 million as a matter of law. On November 17, 2017, the judge granted the Trustee's motion to intervene in the environmental litigation remanded from the bankruptcy court.

On November 22, 2017, the judge entered a final judgment awarding Repsol $65 million in damages and costs against OCC and incorporating his previous orders. On January 8, 2018, OCC filed its notice of appeal from the judge's final judgment, docket number A-2036-17. Intervenor filed his notice of appeal on the same day, docket number A-2038-17.[3]

## IV.

Intervenor argues the motion judge erred when he granted summary judgment to Repsol on OCC's alter ego liability claims in its second amended crossclaim. Intervenor thus urges us to vacate the judgment of the trial court and remand for further proceedings on OCC's alter ego crossclaims. Although

---

[3] On June 13, 2018, the Trust filed a complaint in the bankruptcy court against Repsol, YPF, CLH, and their affiliates, seeking $14 billion for claims asserting alter ego liability and corporate veil piercing, actual and constructive fraudulent transfers and conveyances to avoid Maxus's environmental liability obligations, unjust enrichment, and civil conspiracy. On March 15, 2019, the bankruptcy court denied Repsol's motion to abstain from deciding those claims or abstain due to lack of jurisdiction. In re Maxus Energy Corp., 597 B.R. 235, 240, 248 (Bankr. D. Del. 2019).

the motion judge correctly ruled on Delaware's alter ego liability law, we are satisfied there are genuine issues of material fact concerning Respol's alter ego liability to preclude the resolution of this issue via summary judgment. As the Supreme Court has reaffirmed, "appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001)). We are thus compelled to reverse.

The trial court's decision to grant a motion for summary judgment is strictly based on the standard the Supreme Court codified in Rule 4:46-2(c), which provides summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Because the trial court's decision to grant summary judgment is purely a legal determination, our standard of review is de novo. We thus give "no special deference to the legal determinations of the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

29

A.

In its second amended crossclaim, OCC alleged YPF "devised the scheme" to deplete Maxus's assets, and Repsol had "condoned and continued this [fraudulent] scheme" after acquiring a controlling interest in YPF. OCC claimed all the crossclaim defendants were "alter egos of each other and together constitute[d] a Cohesive Economic Unit" responsible for Maxus's obligations. They had "the same contractual obligations as Maxus under the SPA, including, but not limited to, the obligations to defend, indemnify, and hold harmless [OCC] pursuant to and in accordance with the SPA." If those entities were found to be alter egos or part of a cohesive economic unit with Maxus, OCC argued all of the crossclaim defendants would be contractually liable to pay any judgment or other relief OCC obtained against Maxus.

None of the parties object to the application of Delaware law. However, "[w]hen New Jersey is the forum state, its choice-of-law rules control." Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., LLC, 450 N.J. Super. 1, 34 (App. Div. 2017). Our courts generally look to the laws of the state of incorporation when deciding internal corporate disputes. O'Brien v. Virginia-Carolina Chem. Corp., 44 N.J. 25, 39 (1965); Brotherton v. Celotex Corp., 202 N.J. Super. 148, 154 n.1 (Law Div. 1985).

In November 2015, OCC moved for summary judgment on Repsol's contribution counterclaim. Repsol responded and filed a cross-motion arguing it was not the alter ego of Maxus. Repsol asserted: (1) OCC did not meet the standards under Delaware law for piercing the corporate veil and holding Repsol liable for Maxus's environmental liabilities; and (2) the statute of repose barred OCC's alter ego claims for the alleged fraudulent transfers forming the basis of those claims. Repsol argued OCC could not prove Maxus was a sham, existing as a vehicle for Repsol to cause fraud or injustice, or that Repsol had any control over Maxus in 1996 or 1997, when OCC alleged it was harmed from fraudulent transfers. According to Repsol, OCC "cannot show Repsol's alleged dominance and control in any way contributed to an injury that happened years before Repsol was even there." Stated differently, OCC cannot get past YPF.

OCC argued Repsol, after it purchased YPF, had directly stripped the remaining assets of Maxus and YPF Int'l, which harmed OCC's chances for indemnification or contribution. It asserted Repsol had completely dominated those entities and forced them to sell Maxus's last assets in sham transactions. OCC maintained: "[T]here's not a factual dispute really that once Repsol acquired Maxus, Maxus went from having nearly a billion dollars in assets and positive shareholder equity to hav[ing] less than $100 million in assets and being way underwater." OCC argued it did not have to pierce the veil of any

31

intermediary companies to hold Repsol liable as an alter ego of Maxus; any possibility YPF could pay for Maxus's contractual liabilities under the SPA did not absolve Repsol from its own alter ego liability. OCC also maintained there would be a disputed issue of fact for trial if the court insisted it prove Repsol had abused the corporate form of every intermediary to Maxus.

On April 5, 2016, the judge granted summary judgment and dismissed OCC's alter ego crossclaims against Repsol. He based his ruling on the special master's January 14, 2016 recommendation. The special master recommended the court grant Repsol's motion because, despite resolving all factual disputes in OCC's favor, OCC had failed to meet the legal requirements for establishing Repsol had any "alter ego liability," which extended to Maxus. She thus found no need to reach Repsol's second argument predicated on the statute of repose.

The special master made two preliminary "procedural" determinations: (1) she would resolve "all factual disputes in OCC's favor"; and (2) she would assume, "without deciding, that Maxus and YPF[] [Int'l] (sister corporations) [were] alter egos of one another" under YPF's umbrella.

The special master found Delaware's law was "similar to that in New Jersey." As she explained: "A plaintiff is entitled to pierce the corporate veil by establishing (1) that the subsidiary is a mere instrumentality dominated by the parent company, and (2) that the parent abused the corporate form in a

manner that caused a fraud or injustice." Although an "alter ego liability" determination is "typically a jury question," the special master found the following "key legal question" had to be answered first:

> Must OCC pierce the corporate veils of each corporate entity in the chain between Repsol and Maxus? In its papers, OCC does not set out any basis to pierce the corporate veils of each corporate entity in the chain between Repsol and YPF. The question, then, is whether it must.

In the absence of controlling precedent, the special master noted courts have reached different decisions. She thus compared cases decided by North Dakota, New York, and Delaware federal bankruptcy courts. She found each jurisdiction required the party seeking to pierce the corporate veil do so at each level or layer of ownership within the corporate structure. The special master pointed to In re Heritage Organization, LLC, 413 B.R. 438, 514-15 (Bankr. N.D. Tex. 2009), wherein the bankruptcy court applied Delaware law and found the party seeking to pierce the corporate veil could not simply collapse the corporate empire's chain and perform the veil piercing test on one entity. It had to do so at each layer of ownership.

In this light, the special master rejected OCC's reliance on In re Moll Industries, Inc., 454 B.R. 574, 587 (Bankr. D. Del. 2011), in which the court declined to apply the veil-piercing requirement to each level of the corporate

33

structure. She explained the party seeking to apply alter ego liability in <u>Moll</u> was "not seeking to hold any of the intermediaries liable," that is, was not seeking "global collapse of the corporate structure."

Here, OCC was asking the court "to collapse the entire corporate structure and make multiple intermediaries responsible for Maxus's liabilities." The special master found OCC "present[ed] little basis for doing so." She determined there was insufficient evidence to justify disregarding the corporate form. She explained:

> Nothing in the evidence suggests that Repsol created a series of shell corporations to make it more difficult for OCC to recover. Nor does OCC present evidence that YPF would be unable to meet Maxus's indemnity obligations. Moreover, OCC fails to present any authority for the proposition that Delaware law would allow a party seeking to pierce the corporate veil to skip over a solvent corporation in the corporate chain, or for that matter, that Delaware law would condone veil piercing on a global basis.

The special master concluded:

> Despite the heavy burden for piercing the corporate veil, OCC asks the Court to ignore corporate separateness without providing any equitable basis for doing so. Nor does it provide an equitable basis for departing from the traditional rule, which requires veil piercing at each level. For example, OCC provides no evidence that YPF is insolvent or that it would not be in a position to pay Maxus's indemnity obligations. Nor does it point to any basis for collapsing the corporate structure that separates Repsol and Maxus. Given the

34

exceptional nature of the veil-piercing remedy, OCC was obliged to show some type of inequity. It fails to do so. Therefore[,] Repsol is entitled to summary judgment on this issue. There is simply no basis to disregard the general rule requiring parties to satisfy the veil-piercing requirements at each level of the corporate ladder.

The court followed this line of reasoning and dismissed OCC's alter ego claims against Repsol.

B.

Intervenor argues the court erred when it held sequential veil piercing is the general rule required under Delaware law. Intervenor explains OCC opposed Repsol's motion for summary judgment on theories that do not require the collapse of the entire corporate structure. Although OCC alleged the crossclaim defendants were all alter egos of each other, it also pleaded Repsol had directly stripped assets from Maxus and stole assets from YPF Int'l, Maxus's alter ego. According to intervenor, the relevant question is whether Repsol and Maxus were alter egos of one another because Repsol used its control over Maxus to cause a fraud or injustice to OCC.

Intervenor further argues OCC was not required to prove YPF's assets were insufficient to satisfy a judgment. Quoting <u>Verni ex rel. Burstein v. Harry M. Stevens, Inc.</u>, intervenor claims alter ego liability in New Jersey is an issue of fact for the jury "unless there is no evidence sufficient to justify disregard of

the corporate form." 387 N.J. Super. 160, 199 (App. Div. 2006). Consequently, there was sufficient disputed evidence in the record to show triable issues of fact as to whether Repsol's stripping of Maxus's assets prevented OCC from fully enforcing its indemnification rights.

Under Delaware law, "alter ego claims are common law claims," In re Verizon Ins. Coverage Appeals, 222 A.3d 566, 577 (Del. 2019) (citations omitted), and veil piercing is a doctrine of equity, Sonne v. Sacks, 314 A.2d 194, 197 (Del. 1973) (holding piercing the corporate veil could only be done in Delaware's Court of Chancery). Where a subsidiary corporation is found to be a mere instrumentality of the parent corporation for liability purposes, "the alter ego doctrine is used to pierce the corporate veil when a corporation has created 'a sham entity designed to defraud investors and creditors.'" Verizon, 222 A.3d at 577 (quoting Crosse v. BCBSD, Inc., 836 A.2d 492, 497 (Del. 2003)).

To establish alter ego liability under Delaware law, OCC must prove two elements: (1) the parent and subsidiary operated as a single economic entity as shown by exclusive domination and control; and (2) the corporate structure caused a fraud, contravention of law or contract, public wrong, or similar injustice. Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1183 (Del. Ch. 1999). However, equitable "standards are not carved in stone for all cases because a court of equity must necessarily have the

flexibility to deal with varying circumstances and issues." <u>Nixon v.Blackwell</u>, 626 A.2d 1366, 1378 (Del. 1993).

"To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter ego, has created a sham entity designed to defraud investors and creditors." <u>Crosse</u>, 836 A.2d at 497 (footnote omitted); <u>see also</u> <u>Wallace</u>, 752 A.2d at 1184 (holding, to pierce corporate veil under alter ego theory, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."). The plaintiff, nonetheless, need not prove that the corporation was created with fraud or unfairness in mind; it is sufficient to prove that it was so used.

Delaware's state courts, however, have not squarely decided the issue of sequential veil piercing of a multi-level corporate structure for alter ego liability purposes. In <u>Outokumpu Engineering Enterprises., Inc. v. Kvaerner EnviroPower, Inc.</u>, 685 A.2d 724, 729 (Del. Super. Ct. 1996), the court endorsed sequential veil-piercing among subsidiaries for personal jurisdictional purposes.

Here, the parties in their briefs and the special master's recommendation cite extensively to various other jurisdictions to prove their respective positions and to report a nationwide consensus on sequential veil piercing. Most of the cases cited are unpublished opinions which this court cannot consider as a matter of law. <u>R.</u> 1:36-3. Despite the absence of controlling precedent from the

Delaware state courts, we agree with intervenor in this respect. To hold Repsol liable under an alter ego theory, OCC only needs to show (1) the parent and subsidiary operated as a single economic entity, as shown by exclusive domination and control after 1999, and (2) there was fraud or contravention of law or contract or similar injustice during that time. YPF's own alter ego liability between 1995 and 1999 would not enter that analysis. There are genuine issues of material fact, which preclude the grant of summary judgment on the alter ego liability of Repsol. Because the motion judge did not properly consider these facts, we reverse.

The judge relied only on whether OCC could prove YPF was insolvent and found OCC had not provided any "equitable basis" for ignoring the corporate separateness between Repsol and Maxus. Under Delaware law, however, insolvency is just one of the relevant factors in veil piercing cases. Moreover, the motion court did not conduct a fact-specific inquiry to determine whether Maxus was entirely dominated by Repsol after its 1999 purchase or whether it existed independently at any time. He did not consider evidence regarding the companies' operations, adherence to other corporate formalities, maintenance of corporate records, or capital. These are the factors Delaware's courts consider in determining dominance and control. Equally problematic, the judge did not address the element of fraud or injustice.

A-2036-17

When considered in the light most favorable to OCC, the record shows genuine issues of material fact exist. The factfinder must determine: (1) whether Repsol dominated and controlled Maxus; and (2) whether there was fraud from an inequitable use of the corporate form to avoid liability under the SPA's indemnification clause for the hazardous discharges of Maxus's predecessor. Based on this decision on alter ego, we also reverse the judge's decision to allocate one hundred percent contribution liability to OCC. The trial court's allocation analysis was premised on its finding Repsol was not Maxus's alter ego. If a factfinder determines Repsol is Maxus's alter ego, and Maxus owes indemnification to OCC under the SPA, Repsol cannot maintain a contribution action against OCC as a matter of law.

While OCC and Repsol would be separately liable parties to plaintiffs in a Spill Act recovery action, and to the other settling defendants in a Spill Act contribution action, they are co- or joint tortfeasors to each other as they are both successors under DSC's corporate umbrella, thus sharing DSC's common liability. OCC's predecessor, DSCC, purchased DSC's chemical businesses stock under the SPA while the remainder of DSC's stock, along with its oil and gas concerns, changed their name to Repsol's predecessor, Maxus. Maxus agreed in the SPA to indemnify DSCC.

V.

For the first time on appeal, Intervenor petitions this court to vacate the trial court's order dismissing OCC's fraudulent transfer crossclaim against Repsol as moot or, alternatively, to stay the order. Intervenor does not challenge the merits of the order. Instead, he asserts OCC cannot appeal the ruling, since those fraudulent transfer crossclaims were lost as of the date of Maxus's bankruptcy, precluding OCC's standing to assert them on appeal. Accordingly, intervenor asks this court to prevent an unfair prejudice by asserting original jurisdiction and exercise our equity powers to fashion an equitable remedy by either vacating as moot the court's order or staying the appeal of that order.

We decline to take such extraordinary measures. To understand the basis of our decision, a brief recitation of the background of this issue is warranted.

Effective November 18, 2002,[4] N.J.S.A. 25:2-31 provides:

> A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:
>
> a. Under subsection a. of [N.J.S.A.] 25:2-25, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant;

---

[4] Although this statute was again amended by L. 2021, c. 92, § 12, effective August 10, 2021, the 2002 amendments were controlling at the time of the instant controversy.

b. Under subsection b. of [N.J.S.A.] 25:2-25 or subsection a. of [N.J.S.A.] 25:2-27, within four years after the transfer was made or the obligation was incurred; or

c. Under subsection b. of [N.J.S.A.] 25:2-27, within one year after the transfer was made or the obligation was incurred.

[(L. 2002, c. 100, § 1).]

Prior to this date, N.J.S.A. 25:2-31(a) stated: "Under subsection a. of [N.J.S.A.] 25:2-25, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." L. 1988, c. 74, § 1 (effective Jan. 1, 1989) (emphasis added).

On January 29, 2015, relying on the special master's January 13, 2015 recommendation, the court granted in part a motion to dismiss most of the counts in OCC's second amended crossclaim against Repsol, including OCC's fifth count alleging fraudulent transfers against Repsol and YPF.[5]

The special master previously recommended the trial court find the allegations in OCC's fifth count to be untimely. She concluded "any retroactive application of the [2002] amendment to N.J.S.A. 25:2-31 should be eschewed."

---

[5] The judge incorporated this decision into the final judgment.

A-2036-17

Thus, the question was whether OCC filed its claims "within four years after each transfer" and, if it did not, whether it filed them "within one year after the transfer or obligation was or could reasonably have been discovered" by OCC. The special master explained:

> The operative date for filing OCC's claims is June 29, 2007, the date it filed its motion to amend the complaint. The transfers themselves took place between 1995 and 1999, and the last one was announced publicly on June 2, 2000[,] in an SEC filing. There should be no dispute that OCC did not file its [crossclaims] within four years of the transfers themselves, because it would have had to file them in 2003 rather than in 2007.
>
> . . . .
>
> OCC did not act as a reasonable creditor would have. If it acted as a reasonably [sic], it would have learned about the transfers at issue when they were announced in SEC filings, and it would have brought its claims within one year. It did not. As a result, the claims are barred by the statute of repose in N.J.S.A. 25:2-31.

In this appeal, intervenor does not challenge the merits of the order dismissing OCC's fifth count of its second amended crossclaim. Despite the court's finding of untimeliness, intervenor asserts the Trust's own bankruptcy claims for fraudulent transfer do not depend on OCC's having timely filed its claims. Intervenor makes clear the Trust is not stepping into OCC's shoes. It has filed its "own, much broader fraudulent-transfer claims in federal

42

bankruptcy court that are unaffected by the ruling that OCC's claims were untimely." Rather, intervenor seeks to prevent Repsol from using the court's timeliness dismissal "as res judicata" in the bankruptcy action against Maxus's creditors.

The Supreme Court has acknowledged our discretion to use broad equitable powers to fashion a remedy. Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 531-32 (2008). It is also well-settled that a dismissal for mootness is not an adjudication on the merits. Transamerica Ins. Co. v. Nat'l Roofing, Inc., 108 N.J. 59, 64 (1987). "An issue is 'moot' when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy." Greenfield v. N.J. Dep't of Corrs., 382 N.J. Super. 254, 257-58 (App. Div. 2006) (quoting New York S. & W.R. Corp. v. State Dep't of Treasury, Div. of Taxation, 6 N.J. Tax 575, 582 (Tax Ct. 1984)). However, "an appeal will not be moot when 'a party still suffers from the adverse consequences . . . caused by [the prior] proceeding.'" In re N.J. Dep't of Env't Prot. Conditional Highlands Applicability Determination, 433 N.J. Super. 223, 234 (App. Div. 2013) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. A.P., 408 N.J. Super. 252, 262 (App. Div. 2009)). Here, Repsol properly asserts OCC continues to be subject to the dismissal of its fraudulent transfer crossclaims,

and therefore, still suffers from the consequences of losing its right to recover for those claims.

We are unpersuaded by intervenor's allegation that he needs this court to vacate as moot the judge's order or stay the appeal of that order to prevent Repsol from using the dismissal "as res judicata" in the bankruptcy action. A finding of res judicata or collateral estoppel barring intervenor's claims in the bankruptcy action, most likely will not be sustained by that court.

The doctrine of res judicata

> "contemplates that when a controversy between parties is once fairly litigated and determined it is no longer open to relitigation." Where the second action is no more than a repetition of the first, the first lawsuit stands as a barrier to the second. "The rule precludes parties from relitigating substantially the same cause of action."
>
> [Culver v. Ins. Co. of N. Am., 115 N.J. 451, 460 (1989) (citations omitted).]

To benefit from this doctrine:

> (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.
>
> [Watkins v. Resorts Int'l Hotel & Casino, Inc., 124 N.J. 398, 412 (1991).]

A-2036-17

Here, there was no "valid and final adjudication on the merits" of OCC's fraudulent transfer crossclaims. See Velasquez v. Franz, 123 N.J. 498, 506 (1991). Decisions that turn on timeliness are not decisions on the merits. As we noted in Personal Service Insurance Co. v. Relievus, when "our decision turns on the timeliness of the application, and not its merits, we need not dwell on the parties' underlying dispute." 455 N.J. Super. 508, 510 (App. Div. 2018).

Intervenor emphasizes the fraudulent transfer claims it filed in the bankruptcy action are "much broader" than OCC's crossclaims. Thus, like res judicata, Repsol, more likely than not, will not benefit from raising collateral estoppel in that proceeding. To benefit from collateral estoppel, the party asserting it must demonstrate:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352 (2007) (quoting Hennessey v. Winslow Twp., 183 N.J. 593, 599 (2005)).]

We therefore decline Intervenor's request to vacate the trial court's order dismissing OCC's fraudulent transfer crossclaims against Repsol as moot or, alternatively, to stay the appeal of that order.

VI.

OCC contends the trial court erred when it granted summary judgment to Repsol on its Spill Act contribution counterclaim and held OCC liable for contribution to Repsol of $65 million. Although the trial court properly determined the legal standard of liability for contribution under the Spill Act, we hold the motion judge erred when he granted summary judgment to Repsol on its Spill Act contribution counterclaim. This case is not only about whether Repsol can recover contribution from OCC under the Spill Act. This is a case about the comparative negligence of joint tortfeasors, OCC and Repsol, both successors to DSC, the company that discharged the hazardous substances.

A contribution recovery for Repsol cannot be decided without also considering both its alter ego liability with Maxus and OCC's right to indemnification under the SPA. More importantly, these considerations present genuine issues of material fact that preclude any grant of summary judgment on contribution.

The Spill Act is "remedial legislation designed to cast a wide net over those responsible for hazardous substances and their discharge . . ." on New

Jersey's land and waters. <u>Morristown Assocs. v. Grant Oil Co.</u>, 220 N.J. 360, 383 (2015). It provides two statutory private causes of action for persons, including dischargers, who clean up and remove hazardous contamination: one action to recover damages from DEP or from the Spill Compensation Fund, N.J.S.A. 58:10-23.11k (cost recovery action); and one action to recover cleanup costs from all other dischargers and persons in any way responsible for the discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge, N.J.S.A. 58:10-23.11f(a)(2) (contribution action). <u>N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.</u>, 453 N.J. Super. 272, 292 (App. Div. 2018) (citing <u>Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.</u>, 655 F. Supp. 2d 473, 503 (D.N.J. 2009)). These Spill Act remedies "are in addition to existing common-law or statutory remedies," subject only to the prohibition against double recovery for the same damages or cleanup costs. <u>Dep't of Env't Prot. v. Ventron Corp.</u>, 94 N.J. 473, 493 (1983) (citing N.J.S.A. 58:10-23.11v).

For contribution actions, N.J.S.A. 58:10-23.11f(a)(2)(a) states:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a

hazardous substance.  In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to [N.J.S.A. 58:10-23.11g(c)], and the contribution defendant shall have only the defenses to liability available to parties pursuant to [N.J.S.A. 58:10-23.11g(d) not applicable here].  In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate.  Nothing in this subsection shall affect the right of any party to seek contribution pursuant to any other statute or under common law.

[(Emphasis added).]

N.J.S.A. 58:10-23.11g(c)(1) attaches broad liability as follows:

[A]ny person who has discharged a hazardous substance or is in any way responsible[6] for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.  Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the [DEP] or a local unit[7] pursuant to subsection b of . . . [N.J.S.A.] 58:10-23.11f.

[(Emphasis added).]

---

[6]  The exceptions in N.J.S.A. 58:10-23.11g(12) are not applicable here.

[7]  "'Local unit' means any county or municipality, or any agency or other instrumentality thereof, or a duly incorporated volunteer fire, ambulance, first aid, emergency, or rescue company or squad . . . ."  N.J.S.A. 58:10-23.11b.

"Spill Act liability must be proven by a preponderance of the evidence." N.J. Dep't of Env't Prot. v. Dimant, 212 N.J. 153, 182 (2012). That is, "[a] reasonable nexus or connection" between the use or discharge of a substance and its contamination of the surrounding area "must be demonstrated by a preponderance of the evidence." Ibid. "Discharge" is defined by the Act as

> any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State.
>
> [N.J.S.A. 58:10-23.11b.]

Nevertheless, "[a] party even remotely responsible for causing contamination will be deemed a responsible party under the Act." In re Kimber Petroleum Corp., 110 N.J. 69, 85 (1988).

In resolving contribution claims, N.J.S.A. 58:10-23.11f(a)(2)(a) authorizes the court to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." Indeed, "a claim for contribution, unlike one for indemnification, requires a factfinder to apportion fault among defendants." Mettinger v. Globe Slicing Mach. Co., 153 N.J. 371, 389 (1998). "The Legislature went further to ensure private entity dischargers were not prevented from seeking other recourse in the

courts, dictating that '[n]othing in [N.J.S.A. 58:10-23.11f(a)(2)(a)] shall affect the right of any party to seek contribution pursuant to any other statute or under common law.'" Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 403-05 (2014) (alterations in original) (quoting N.J.S.A. 58:10-23.11f(a)(2)).

As guidance to aid in the equitable allocation of Spill Act contribution costs, our courts have often looked to the so-called "Gore factors." Ibid. The Gore factors were proposed, but never passed, as an amendment to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-675, by then-Congressman Al Gore. Lenox Inc. v. Reuben Smith Rubbish Removal, 91 F. Supp. 2d 743, 747 (D.N.J. 2000). These factors include the following considerations:

> (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (2) the amount of the hazardous waste involved;
>
> (3) the degree of toxicity of the hazardous waste involved;
>
> (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

[Ibid.]

In Hatco Corp. v. W.R. Grace & Co., 836 F. Supp. 1049, 1090 (D.N.J. 1993), modified on reconsideration on other grounds, 849 F. Supp. 987 (D.N.J. 1994), the United States District Court applied similar factors as in Lenox, but also mentioned such considerations as "acquiescence" in or knowledge of the contamination, the parties' degrees of care, and any financial benefit to the parties from the remediation.

OCC raises three main arguments involving the Spill Act and challenging the trial judge's decisions on: (1) contribution liability; (2) allocation of contribution liability; and (3) how the judge's holding on alter ego affects the contribution award to Repsol. We will address these arguments in the order presented.

OCC first argues the judge erred when he found joint and several liability applies in a Spill Act contribution action. OCC asserts the judge confused the scope of liability in a cost recovery action (strict, joint and several) with the standard of liability in a contribution action because the Spill Act only requires the application of joint and several liability as the standard for contribution.

51

OCC relies on the plain language of the Spill Act, its legislative history, and Spill Act and federal CERCLA caselaw.

Contribution is a principle of liability sharing. The Legislature's "basic purpose in creating the right of contribution [in the Spill Act] was to achieve 'a sharing of the common responsibility [among tortfeasors] according to equity and natural justice.'" Rowe v. Bell & Gossett Co., 239 N.J. 531, 553 (2019) (second alteration in original) (quoting Magic Petroleum, 218 N.J. at 403). As our Supreme Court explained in Magic Petroleum:

> The purpose of the contribution amendment to the Spill Act was to encourage prompt and effective remediation by those parties responsible for contamination who might otherwise be reluctant to cooperate in the remediation efforts for fear of bearing the entire cost of cleanup when other parties were also responsible for the creation and continuation of the discharge.
>
> [218 N.J. at 403 (citations omitted).]

We were unable to find a published opinion that directly addresses the specific standard of liability for contribution actions under the Spill Act. Here, however, the judge correctly noted N.J.S.A. 58:10-23.11f(a)(2)(a) unequivocally states what is required: "In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to [N.J.S.A. 58:10-23.11g(c)]." N.J.S.A. 58:10-23.11g(c)(1) states "any person who has discharged

52

a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." Based on the plain language of these statutes, the judge correctly held the standard for contribution purposes was joint and several liability amongst the dischargers and those responsible in any way for the discharge.

Thus, pursuant to N.J.S.A. 58:10-23.11g(c)(1), OCC and Repsol are both liable to each other and to all other dischargers and persons "in any way responsible" and "shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." Those seeking contribution, such as Repsol, must prove the required nexus between the parties and the pollution. N.J.S.A. 58:10-23.11f(a)(2)(a). In resolving contribution claims between all the liable entities, the court could allocate the costs of cleanup and removal by "using such equitable factors as the court determines are appropriate[,]" including the Gore factors. N.J.S.A. 58:10-23.11f(a)(2)(a); Magic Petroleum, 218 N.J. at 403-05.

OCC next argues the judge erred by allocating only the relative liabilities of OCC and Repsol and finding OCC was one hundred percent liable and Repsol was zero percent liable. OCC contends the judge should have considered the fault of the hundreds of other settling defendants in the underlying action. In

this approach, OCC rejects Repsol's reliance on caselaw in which the courts have equitably allocated contribution responsibility to one person after considering the liability of all parties involved.

OCC also argues the judge erred in finding it liable for more than its fair share of the contamination and for allowing Repsol to arbitrarily select its victim out of the hundreds of other responsible parties. OCC maintains the judge must apply the Gore factors to determine an ultimately fair and equitable sharing of the remediation burden among all responsible parties. OCC urges us to reverse the trial court and remand to allow the judge to make the necessary factual findings on a full record to determine OCC's several share of liability among all responsible parties.

OCC also urges us to reverse the judge's allocation of liability because there are genuine issues of material fact in dispute. OCC alleges the judge made at least two factual errors concerning defendant's cooperation with plaintiffs and the distinguishability of the discharges. According to OCC, the judge erroneously found: (1) OCC refused to participate in settlement negotiations with plaintiffs, and (2) Maxus settled with plaintiffs only on its own behalf. Although OCC was not part of the Repsol and Maxus/Tierra settlement, there is evidence to show it participated and ultimately settled with plaintiffs. Maxus also resolved certain damage claims brought by plaintiffs against OCC.

54

We do not have to reach, however, the issues of whether the court should have considered all the settling defendants' percentages of fault for the contamination or applied the Gore factors.  As successors under the corporate umbrella of DSC, both OCC and Repsol would be separately liable parties in any way responsible to plaintiffs in a Spill Act recovery action and to the other settling defendants in a Spill Act contribution action.  They are also co- or joint tortfeasors to each other by sharing DSC's common liability.  OCC's predecessor, DSCC, purchased DSC's stock in its chemical businesses under the SPA, while the remainder of DSC's stock and oil and gas concerns changed their name to Repsol's predecessor, Maxus, which agreed in the SPA to indemnify DSCC.

The JTCL provides for contribution between co- or joint tortfeasors.  Under that statutory scheme, "joint tortfeasors" are "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."  Krzykalski v. Tindall, 232 N.J. 525, 534 (2018) (quoting N.J.S.A. 2A:53A-1).  The statute provides:

> Where injury or damage is suffered by any person as a result of the wrongful act, neglect or default of joint tortfeasors, and the person so suffering injury or damage recovers a money judgment or judgments for such injury or damage against one or more of the joint

tortfeasors, either in one action or in separate actions, and any one of the joint tortfeasors pays such judgment in whole or in part, he shall be entitled to recover contribution from the other joint tortfeasor or joint tortfeasors for the excess so paid over his pro rata share . . . .

[N.J.S.A. 2A:53A-3.]

Therefore, contrary to OCC's arguments, the judge did not need to consider the other "responsible parties," such as third-party defendants, to allocate fault and contribution between OCC and Repsol. Furthermore, since OCC purchased DSC's chemical "discharging" assets, and Repsol inherited the rest of DCS's non-discharging assets, OCC would be liable to Repsol for contribution. That is, OCC could not show the required "reasonable link" or nexus between the discharge of hazardous substances, Repsol, and the contamination. See Dimant, 212 N.J. at 182.

The hurdle to granting summary judgment is indemnification. Indemnification is a principle of liability shifting. The judge held Maxus had to indemnify OCC for all its past liability under the Spill Act, regardless of fault. This includes DSC's liability, the liability of DSC's predecessors, and OCC's own liability during the Chemicaland era. Under the JTCL, "no person shall be entitled to recover contribution under this act from any person entitled to be indemnified by him in respect to the liability for which the contribution is

sought." N.J.S.A. 2A:53A-3. Thus, by applying the JTCL, Maxus, and possibly its successors, cannot recover contribution from OCC.

## VII.

OCC contends the court erred by denying its motion for leave to amend or supplement its second amended crossclaim by adding an allegation against Repsol for tortious interference with the SPA's indemnification clause. We decline to address this matter here. OCC must make an appropriate application to file its supplemental pleadings upon remand to the trial court.

## Conclusion

We reverse the trial court's holdings on alter ego liability in the appeal under docket A-2038-17 and on Spill Act contribution in the appeal under docket A-2036-17, and remand both cases to the Law Division. Although the trial court correctly ruled on Delaware's alter-ego-liability law and necessary sequential veil piercing of a complex corporate organization, there are genuine issues of material fact that preclude the grant of summary judgment to Repsol on alter ego liability, especially as to the necessary element of fraud. Furthermore, although the court properly determined the legal standard of liability for contribution under the Spill Act, there are genuine issues of material fact that preclude any grant of summary judgment to Repsol on contribution. The trial court also erred by not considering contractual indemnification. Finally, since

57

we remand in each appeal, OCC must make an appropriate application to the trial court to supplement its pleadings.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2036-17